COLEMAN, JUSTICE,
FOR THE COURT:
¶ 1. A jury convicted Robert Carson of capital murder, being a felon in possession of a firearm, and conspiracy to commit armed robbery, all of which arose from the shooting death of Juan Ortiz during an armed robbery in Madison County on April 30, 2012. Carson received a life sentence without the possibility of parole for his capital-murder conviction, a ten-year sentence for being a felon in possession of a firearm, and a five-year sentence for conspiracy to commit armed robbery. On appeal, Carson argues that his trial counsel was ineffective for failing to request an instruction regarding the unreliability of accomplice testimony and that there is a “reasonable probability” that there would have been a different outcome at trial if counsel had requested the instruction. He also argues that he was entitled to receive his proposed instruction D-6. We find his arguments to be without merit and affirm.
FACTS AND PROCEEDINGS BELOW[1]
¶ 2. On April 30, 2012, Robert Carson, Bobby Allen, and Edward Earl Clay spent the day together at the apartment of Crystal Brent, Carson’s cousin, barbecuing on the grill, smoking cigarettes and marijuana, and consuming codeine and beer. Between seven and eight o’clock that evening the men ran out of money for cigarettes and beer, so they decided to go out and “hit a lick,” meaning rob someone at gun *25 point. The men got into a grey rental car, drove to Ridgeland, and started driving around apartment complexes looking for someone to rob. Both Carson and Clay were carrying guns. Carson’s gun was a black semiautomatic handgun. Clay’s was a .38 special revolver. Allen was the getaway driver.
¶ 3. Around 11 o’clock that evening, the three men drove into the Ridgeland Ranch apartment complex. They backed the car into a parking spot, smoked marijuana, and waited for another car to drive up. After waiting for ten or fifteen minutes, the men saw Jose Ortiz drive into the apartment complex. Ortiz was the manager of Margarita’s Mexican restaurant on County Line Road and was returning home after the dinner shift. Ortiz was carrying almost $600 in cash.
¶ 4. Carson got out of the car, carrying his semiautomatic handgun. After Carson had been out of the car for two or three minutes, Clay got out of the car to help Carson with the robbery. Carson approached Ortiz in the parking lot. Clay stood about five feet away. Carson pointed his gun at Ortiz, and Ortiz took out his wallet and turned it inside out so that its contents fell to the ground. After Ortiz had emptied his wallet, Carson shot Ortiz in the face. Carson collected the money from the ground and then searched Ortiz’s pockets for more money. Carson and Clay ran back to the car. When they got back to Jackson, the men divvied up the stolen money and used it to buy beer and cigarettes. Each man received approximately $120 from the crime.
¶ 5. After the shot was fired, Jose Hernandez, a resident of the Ridgeland Ranch complex and one of Ortiz’s neighbors, saw an African-American man wearing a blue ACE shirt running between the buildings. Hernandez called the Ridgeland Police Department, and police officers arrived at the apartment complex five minutes later. The Ridgeland police officers discovered Ortiz’s dead body lying in the back seat of his car and $177.28 in mixed bills and change in Ortiz’s front pocket.
¶ 6. Based on an anonymous tip, the Ridgeland Police Department identified Carson as a suspect in Ortiz’s murder. Carson was arrested on May 3, 2012, and was charged with capital murder and armed robbery. After Carson’s arrest, the Ridgeland Police Department identified both Clay and Allen as suspects. Clay and Allen turned themselves in to police on May 17, 2012. They gave separate statements to police in which they confessed to the armed robbery and said that Carson had shot Ortiz. On July 26, 2012, a Madison County grand jury returned an indictment against Carson, charging him with capital murder, being a felon in possession of a firearm, and conspiring with Clay and Allen to commit armed robbery. The Ridgeland Police Department was unable to find the gun that was used to shoot Ortiz.
¶ 7. Carson’s trial commenced on March 4, 2014. Hernandez testified that, although he had heard a shot fired, he did not see anyone shoot Ortiz. He also testified that he had seen a tall, thin African-American man wearing a blue ACE shirt running between the apartment complex’s buildings.
118. Officer Rodney Hale testified that he was the first officer from the police department to arrive at the scene. Hale described finding Ortiz’s body in the back of his car. He said that Ortiz was holding his wallet, which was turned inside out. Adrian Ready, a detective with the Ridge-land Police Department, also testified on the State’s behalf. Detective Ready testified, without objection, that the police department had procured surveillance footage of Ortiz purchasing beer at a local *26 convenience store at 11:08 p.m. and that Hernandez’s call to the Ridgeland Police Department was made at 11:20 p.m. Thus, Ready deduced that the crime had occurred during the twelve minutes between 11:08 and 11:20 p.m. Ready averred (without objection) that the surveillance footage from the gas station did not show that Ortiz was being followed by anyone. The police department tried to dust Ortiz’s car for fingerprints, but officers were unable to obtain any. According to Ready, the police department was unable to find either the assailant’s gun or a spent shell casing.
¶ 9. Clay testified for the State. He said that he had pleaded guilty to armed robbery and that, although he had not been sentenced yet, he expected to be sentenced to twenty-five years of incarceration to be served day-for-day. Clay said that it was his idea for the men to go out and “hit a lick” for money with which to buy beer and cigarettes. Clay testified that the men drove to the Ridgeland Ranch apartment complex for the purpose of committing an armed robbery and that Carson brought a semiautomatic handgun. According to Clay, after the men saw Ortiz drive by, Carson got out of the car to find Ortiz. Clay averred that he got out of the car two or three minutes later to help Carson commit the robbery. Clay said that he was standing about five feet away from Carson when Carson pointed his gun at the victim. Ortiz then flipped his wallet inside out. Clay testified that, after Ortiz had emptied his wallet, Carson shot Ortiz in the face and searched his pockets for money. Clay said that, after he and Carson had returned to the car to meet Allen, he seen Carson’s gun and noticed that a shell casing was lodged in the gun’s chamber.
¶ 10. On cross-examination, Clay admitted that, at the time of the crime, he was high on marijuana and codeine. He said that he had been convicted of burglary of a dwelling, burglary of an automobile, and automobile theft. He averred that he had pleaded guilty to armed robbery but that his plea deal was not contingent upon his testimony against Carson. He also said that, after he had taken the plea deal, he mailed the following to police:
I lied about the confession I made to [the] investigator about the crime that took place on April 80, 2012, armed robbery and capital murder due to ... [the] severity of the charges. All I was thinking about was going home ’cause I was out on [early release supervision], I was afraid that ... they was gone [sic] violate me. I didn’t have any knowledge about this case. I’m sorry All I wanted to do was go home.
Clay testified that he wrote the recantation because he thought that all of the charges would be dropped because the prosecution did not have any evidence.
¶ 11. The State called Dr. Amy Grusz-ecki, a forensic pathologist, who performed the autopsy on Ortiz. She testified that Ortiz had died as a result of blood loss from a gunshot wound to his face.
¶ 12. Finally, the State called Aretha Brent, Carson’s cousin, to testify. She said that Carson had told her, “well, if I killed [Ortiz], I just did it, you know. I’m just tired of people saying I did it.” Carson admitted to Brent that he had robbed Ortiz, but he did not tell her that he had shot or killed him. Brent testified that the Ridgeland Police Department had offered to dismiss her outstanding warrants for failure to pay traffic tickets in exchange for her testimony.
¶ 13. Crystal Brent was called as a witness in Carson’s defense. Brent said that she had seen Carson at the barbecue held at her apartment on April 30, 2012, that she had seen him leave, and that she did not see him return.
*27 ¶ 14. Bobby Men did not testify at Carson’s trial because he had invoked his Fifth Amendment right to remain silent.
¶ 15. The jury returned guilty verdicts against Carson on all three charges. Carson received a life sentence without the possibility of parole for his capital-murder conviction, a ten-year sentence for being a felon in possession of a firearm, and a five-year sentence for conspiracy to commit armed robbery. The trial court ordered that Carson’s sentences for felon in possession of a firearm and conspiracy to commit armed robbery would run consecutively to each, other. The trial court determined that both sentences should run concurrently with Carson’s life sentence for capital murder.
¶ 16. On July 29, 2015, the Court received an affidavit by mail, ostensibly from Bobby Men. In the affidavit, executed on July 27,2015, Men said that he had lied to investigators about Carson’s involvement in the crime. He swore that he and Clay had conspired to blame the crimes on Carson because they hated him. He said that Carson was not with Men and Clay when the crime was committed and that he had decided to come forward with the new, .contradictory information because he did not want to see an innocent man punished with life imprisonment.
DISCUSSION
I. Whether Carson’s trial counsel was ineffective for failing to request a cautionary instruction about the reliability of accomplice testimony,
¶ 17. First, Carson argues that his trial counsel was ineffective because she failed to request an instruction cautioning the jury about the unreliability of accomplice testimony. A defendant in a criminal case is entitled, under both the United States and Mississippi Constitutions, to effective assistance of counsel. U.S. Const, amends. VI, XIV; Miss. Const, art. 3, § 26; Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Strickland v. Washington, the United States Supreme Court articulated the test for considering a constitutional claim of ineffective assistance of counsel. First, the court must determine whether the defendant received reasonably effective assistance of counsel. Strickland, 466 U.S. at 687-88,104 S.Ct. 2052. Second, if it is determined that the defendant did not receive reasonably effective assistance of counsel, the reviewing court must determine whether the insufficiency had á “reasonable probability” of affecting the outcome of the case. Id. at 695. A “reasonable probability” méáns that the confidence of the court in the outcome is undermined, not that it is certain that the verdict would have been different. Id.
¶ 18. Génerally, ineffective-assistance claims are raised during post-conviction proceedings. Archer v. State, 986 So.2d 951, 955 (Miss. 2008). However, a claim of ineffectiveness may be raised on direct appeal “if such issues are based on facts fully apparent from the record.” M.R.A.P. 22(b).
¶ 19. Initially, we must determine whether Carson’s trial counsel was ineffective. The “[cjlear law in the State of Mississippi is that the jury is to regard the testimony of co-conspirators with great caution and suspicion.” Derden v. State, 522 So.2d 752, 754 (Miss. 1988) (citations omitted). When determining whether a defendant is entitled to a cautionary instruction to this effect, the trial judge considers: (1) whether the witness was in fact an accomplice and (2) whether the witness’s testimony was corroborated. Brown v. State, 890 So.2d 901, 910 (Miss. 2004) (citing Burke v. State, 576 So.2d 1239, 1242 (Miss. 1991)). Mhough the decision to *28 grant a cautionary, instruction about the testimony of an accomplice ordinarily is within the trial judge’s discretion, this instruction is mandatory when the accomplice’s testimony is the sole basis for the conviction and when the defendant’s guilt is otherwise not clearly proven. Wheeler v. State, 560 So.2d 171, 173 (Miss. 1990) (citations omitted).
¶ 20. We hold that Carson’s counsel provided constitutionally deficient performance by failing to request an accomplice-testimony instruction. The State used Edward Earl Clay’s testimony to identify Carson as the shooter, and there can be no strategic explanation for forgoing a jury instruction that would have discredited Clay’s testimony.
¶ 21. However, we do not hold that Carson has shown that his counsel’s deficient performance prejudiced his defense. Under Strickland, to establish constitutionally ineffective assistance, “the defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Here, the jury heard testimony from a nonaccomplice witness—Aretha Brent—that Carson had admitted his involvement in the robbery. Further, the jury heard about Clay’s involvement in the crime. He testified that he had pleaded guilty to armed robbery and that he had not yet been sentenced. Certainly, the jury could deduce that Clay had an incentive to lie. We do not conclude that a reasonable probability exists that the result would have been different with an accomplice-testimony instruction.
II. Whether the trial court erred by refusing to give proposed jury instructions D-6 and D-7 to the jury.
¶ 22. Carson argues that the trial court erred by refusing to give his proposed instructions D-6 and D-7 to the jury. This Court reviews a trial court’s decision to refuse requested jury instructions for an abuse of discretion. Newell v. State, 49 So.3d 66, 73 (Miss. 2010). “The instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context.” Young v. State, 891 So.2d 813, 819 (Miss. 2005) (citing Howell v. State, 860 So.2d 704, 761 (Miss. 2003)). When read together, if the jury instructions convey the law of the case and create no injustice, there is no reversible error. Newell, 49 So.3d at 73 (citing Rubenstein v. State, 941 So.2d 735, 784-85 (Miss. 2006)). We have held that “[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Hearn v. State, 3 So.3d 722, 738 (Miss. 2008) (citing Chandler v. State, 946 So.2d 355, 360 (Miss. 2006)).
¶ 23. Carson argues that the trial court erred in not granting his proposed instruction D-6:
The law presumes every person charged with the commission of a crime to be innocent. The presumption places upon the State the burden of proving the defendant guilty of every material element of the crime with which the defendant is charged. Before you can return a verdict of guilty the State must prove to your satisfaction beyond a reasonable doubt that the defendant is guilty. The presumption of innocence attends the defendant through the trial and prevails at *29 the close of trial unless overcome by evidence that satisfies the jury of the defendant’s guilty [sic] beyond a reasonable doubt. The defendant is not required to prove his innocence. ■
Instead, the trial court gave jury instruction C-2:
The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State of Mississippi the burden of proving the Defendant guilty of every material element of the crime with which he is charged. Before you can return a verdict of guilty, the State must prove that the Defendant is guilty beyond a reasonable doubt. The Defendant is not required to prove his innocence.
Read with instruction C-2, instruction D-6 added only that “[t]he presumption of innocence attends the defendant through the trial and prevails at the close of trial unless overcome by evidence that satisfies the jury of the defendant’s guilty [sic] beyond a reasonable doubt.” By instructing the jury that the-“presumption places upon the State of Mississippi the burden of proving the Defendant guilty” and that “the State must prove that the Defendant is guilty beyond a reasonable doubt,” the trial court provided the jury every component of Carson’s instruction, but in different language.
¶ 24. In Harris v. State, we found that the jury instructions “adequately informed the jury on the burden of proof.” Harris v. State, 861 So.2d 1003, 1015-16 (Miss. 2003). We identified the key requirements for instructing the jury on the State’s burden: “that the burden of proof is on the State, and ‘The Defendant is not required to prove anything.’ ” Id. at 1016. Here, C-2 informed the jury that the State bore the burden of proof, that it must prove each element of the crime beyond a reasonable doubt, and that Carson enjoyed a presumption of innocence.
¶ 25. Carson argues that the trial court erred in denying Instruction D-7. The proposed-but-denied Instruction D-7 stated in pertinent part:
The Court instructs the jury that under the law no juror has the right to convict, nor should convict, Robert Carson upon mere suspicion regárdless of how strong the suspicion may be or simply because there is, or may be, a reason to suspect the defendant is guilty. The Court now instructs you, ladies and gentlemen of the Jury, that suspicion, no matter how-strong or convincing, never rises to the dignity of evidence under the law, and before you or your oath as Jurors can lawfully convict Robert Carson you must be convinced upon the evidence and the evidence alone, that Robert Carson is guilty beyond a reasonable doubt.
According to Carson, the trial court erred in denying this instruction because the information is not found in the granted jury instructions. However, Instruction C-l, provided to the jury instead of D-7, read in pertinent part:
... It is your function to determine the facts in this case and to consider and weigh the evidence for that purpose. You are to apply the law to the facts, and in this way decide the case. You are also permitted to draw such reasonable inferences from the evidence as seems justified in the light of your own experience. It is your prerogative to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified. You should not be influenced by bias, sympathy or preju *30 .dice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture. ...
The instruction further instructed the jury that the trial court’s rulings on the admissibility of evidence should not be speculated upon as the Court favoring one party or the other, as those decisions were “controlled and governed by rules of law.” Instruction C-l does not discuss “suspicion” in the same length as Instruction D-7, but Instruction C-l provides the same effect: that the jury should consider only the .admitted evidence and any “reasonable inferences” adduced therefrom, and that the jurors should not allow “bias, sympathy or prejudice .,. speculation, guesswork or conjecture” to decide the case in place of the evidence.
¶ 26. In Moise v. State, 159 So.3d 1205, 1208-09 (¶¶ 7-14) (Miss. Ct. App. 2015), the Court of Appeals considered a nearly identical refused instruction. Moise’s proposed instruction, like Carson’s, instructed the jury that “under the law you do not have the right to convict Richard Moise upon mere suspicion, regardless. of how strong that suspicion might be.” Id. at 1209 (¶11). The trial court denied that instruction because it believed the information was covered in the other instructions, in particular, one that read that the jury’s verdict “should be based on the evidence[ ] and the law and not upon speculation, guesswork[,] or conjecture.” Id. at (¶ 13). The Court of Appeals held that the trial judge had not erred. Id. at (¶ 14). “[T]he information from the proposed Instruction ... was covered by other instructions, and it is not error for a trial court to ‘refuse .,. jury instructions that ... are covered fairly elsewhere in the instructions.’” Id. (citing Dora v. State, 20 So.3d 46, 50 (¶ 16) (Miss. Ct. App. 2009)).
¶ 27. When read as a whole, Instructions C-l and C-2 properly instructed the jury on the presumption of innocence and the necessity of ignoring unfounded suspicion and speculation during deliberations. We hold that the instructions fairly announced the law, and that the circuit judge did not err by denying proposed instructions D-6 and D-7.
III. Whether the Court should consider Bobby Allen’s affidavit,
¶ 28. On July 29, 2015, the Court received a purported affidavit from Bobby Allen, one of Carson’s alleged coconspira-tors. In this document, which bears the date July 27, 2015, Allen says that he lied to investigators about Carson’s involvement in the crimes against Ortiz and that he, Allen, is the man who robbed, shot, and killed Ortiz.
¶ 29. Rule 22(b) of the Mississippi Rules of Appellate Procedure provides: “Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record.” (Emphasis added.) In Havard v. State, 928 So.2d 771, 786 (Miss. 2006), the Court declined to consider affidavits that were not part of the trial record but were submitted in support of one of the defendant’s claims. The Havard Court held that it was “not about to embark upon a journey of a carte blanche consideration of outside-the-record documents ... to decide issues on direct appeal”—especially when the documents had not been subjected to the same evi-dentiary standards as evidence submitted at trial. Id.
¶ 30. Given that Allen’s purported affidavit is not properly before this Court because it is not in the designated record, we will not consider it in Carson’s direct appeal.
*31 IV. Whether Carson’s multicount indictment was facially defective.
¶ 31. On December 14, 2015, Carson filed pro se a Motion to Supplement Appeal Brief. Carson stated that an additional issue exists that the Court needs to consider. Carson attached his proposed supplemental brief to the Motion as an exhibit.
¶ 32. Mississippi Rule of Appellate Procedure 28(b) allows an appellant in a criminal appeal to file a pro se supplemental brief, which “may address issues not raised by counsel, but such issues must be based on the record.” The pro se brief otherwise must follow Court requirements for content and form. Carson’s brief argues that his indictment, which forms part of the record before us, is facially defective. The State failed to respond to Carson’s Motion to Supplement Appeal Brief. We grant his motion and consider the merits of his argument.
¶ 33. Carson states that Count I of his multicount indictment fails to identify the victim of the underlying crime, and Count III fails to identify the victim of the conspiracy. “[Tjhis Court has squarely held that challenges to the substantive sufficiency of an indictment are not waivable. Thus, they may be raised at anytime, including on appeal.” State v. Berryhill, 703 So.2d 250, 254 (¶ 16) (Miss. 1997) (holding that a granted motion to quash, filed after the empanelment of the jury, was not untimely). “For example, a challenge to an indictment for failure to charge the essential elements of a criminal offense affects a fundamental right, and may not be waived.” Ross v. State, 954 So.2d 968, 1015 (¶ 126) (Miss. 2007) (citing Jefferson v. State, 556 So.2d 1016, 1019 (Miss. 1989) (noting the essential-elements exception to the general rule that guilty pleas waive defects in the indictment)). Carson argues that the identity of the victim is an essential element of the crimes charged, so the omissions in his indictment render it fatally flawed, and he requests that the Court vacate his convictions arising out of Counts I and III.
¶ 34. The sufficiency of an indictment is a question of law, and therefore is reviewed de novo. Berry v. State, 996 So.2d 782, 785-86 (¶ 8) (Miss. 2008) (quoting Quang Thanh Tran v. State, 962 So.2d 1237, 1240 (Miss. 2007)). “So long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment'is legally sufficient.” Farris v. State, 764 So.2d 411, 421 (¶28) (Miss. 2000) (citing Harrison v. State, 722 So.2d 681, 687 (Miss. 1998)). Carson correctly cites Burks v. State, 770 So.2d 960, 963 (¶ 12) (Miss. 2000), for the proposition that where the identity of the victim is an essential element of the crime charged, the indictment indeed must state the name. A failure to do so “or a material variance between statement and proof is fatal, but an immaterial variance is not.” Id. (quoting Hughes v. State, 207 Miss. 594, 603, 42 So.2d 805, 807 (1949)).
¶35. Count I of Carson’s indictment charged him with the murder of Ortiz with the underlying felony of robbery:
Robert Carson, ... did, without authority of law and with or without any design to effect death, kill and murder Jose Gurrola Ortiz,, a human being, and while [Carson] was then and there engaged in the commission of the crime of a robbery, in violation of Miss. Code Ann. § 97-3-73 (1972, as amended), and in violation of Miss. Code Ann. § 97-3-19(2)(e) (1972, as amended)[.]
Arguing that this count is defective, Carson cites Coffield v. State, 749 So.2d 215, 217 (Miss. Ct. App. 1999), claiming that the Court of Appeals therein “established *32 that the identity of the victim is an essential element of the crime, of robbery.” However, Coffield had been convicted of the deliberate-design murder of his wife and appealed, claiming that, because the indictment failed to specify that his wife had been a human being, it was fatally defective. Id. at 217 (¶ 5). The State had not charged Coffield with robbery; the only mention of it lay within the discussion of Mississippi statutes which define crimes against other persons. Id. at 217 (¶ 7). The Court quoted the statutes for robbery and assault to show that those statutes “omit any specific requirement that the victim be a human being,” and concluded that the State is not required to charge or present any proof that the victim was in fact a human being, other than giving the “specific identity of the victim[.]” Id. Accordingly, Coffield has no bearing on the issue.
¶ 36. In Batiste v. State, 121 So.3d 808 (Miss. 2013), we considered an analogous situation. Appealing his conviction for murder with the underlying felony of robbery, Batiste argued that his indictment was defective because it failed to “recite the item or items stolen.” Id. at 835 (¶ 41). According to Batiste, this omission prejudiced his defense because “he was forced to guess which of the objects the State would claim were the subject of the robbery and part of the res gestae of the crime.” Id. at 835-36 (¶ 41). Wé rejected his argument. A criminal defendant has a constitutional right “to be informed of the nature and cause of the accusation[ ]” against him. U.S. Const, amend. IV; see also Miss. Const, art 3, § 26 (1890). An indictment which tracks the language of the criminal statute is sufficient to place the defendant on notice of the charge against him. Batiste, 121 So.3d at 836 (¶ 43) (citing Stevens v. State, 808 So.2d 908, 912 (Miss. 2002)). Regarding capital-murder cases, for which both Batiste and Carson were charged, “unless the underlying felony is burglary, ‘the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged.’ ... No further detail is required.” Id. (quoting Goff v. State, 14 So.3d 625, 665 (Miss. 2009); Miss. Code Ann. § 99-17-20). We concluded in Batiste that requiring the State to list the items stolen within a capital-murder indictment with the underlying felony of robbery would, in fact, “require even more detail than a robbery indictment” alone. Batiste, 121 So.3d at 836 (¶ 43); see also Randall v. State, 148 So.3d 686, 688-89 (Miss. Ct. App, 2014) (holding that a capital-murder indictment with the underlying felony of robbery did not require the State to list the elements of robbery where robbery was stated in the indictment and the sections of the Mississippi Code properly cited therein). As with Batiste, Carson’s indictment provided that the felony underlying his capital-murder charge was robbery and stated the "Code section defining the crimes of robbery and of capital murder.
¶ 37. However, Carson and the dissent argue that Rowland v. State, 98 So.3d 1032 (Miss. 2012), “established that the identity of the victim of an underlying armed robbery is an element of capital murder that must be stated in the capital murder indictment.” In Rowland, the Court considered a post-conviction relief case in which three masked men carrying firearms, one of whom was Rowland, entered a country club at which eight men were playing poker and robbed the players, shooting and killing two of the victims in the process. Id. at 1033 (¶2). Rowland was charged and pleaded guilty to four counts: (1) capital murder of James Campbell while committing the crime of armed robbery “of Pat Bolton and others,” (2) capital murder of *33 Paul Hughes while committing the crime of armed robbery “of O.B. Singleton and others,” “(3) armed robbery of Pat Bolton, and (4) armed robbery of O.B. Singleton.” Id. at 1033-34 (¶ 3). Rowland argued that the four-count indictment violated his constitutional right against double jeopardy, and the Court agreed. The Court held that the State had failed to place Rowland on sufficient notice of the charges against him: “Rowland could not have been convicted on an indictment of capital-murder based on the ‘armed robbery of ... others,’ ” but only on the “armed robberies of the individuals named in the indictments: O.B. Singleton and Pat Bolton.” Id. at 1039 (¶ 12). Further, by convicting Rowland of two counts of capital murder with the underlying offense of armed robbery of Bolton and Singleton and two counts of armed robbery of Bolton and Singleton, the State improperly had placed Rowland in double jeopardy. Id. (¶ 13).
¶ 38. Carson is correct that the Rowland Court wrote as follows:
[a] capital-murder indictment that fails to identify the victim of the underlying crime does not contain sufficient facts to fairly inform the defendant of the charge against which he must defend and to enable him to plead double jeopardy in the event that he is separately punished or later prosecuted for the underlying felony; in other words, the identity of the victim of the underlying felony is an element of the offense of capital murder that must be stated in the capital murder indictment.
Id. (¶ 12). The Rowland Court wholly failed to cite authority for the above-quoted indentity-as-element proposition which, for good measure, contradicts the principle of sufficiency of a capital-murder indictment found in Batiste and Goff, above. Because we now realize that the above-quoted language contradicts prior caselaw such as Goff and encroaches upon the legislative prerogative to establish the elements of crimes, we today overrule Rowland to the extent that it may be read to hold the identity of the victim of an underlying felony is an element of the offense of capital murder.
¶ 39. Because the Rowland Court made the slight—yet significant—misstep of looking at the “charges as indicted” rather than the elements of the crimes charged, to reach the conclusion that Rowland’s double-jeopardy rights had been violated, the Court forced itself to consider the name of the victim as an element of the crime. Id. at 1039 (¶ 13). The Court in Rowland recited what it considered to be the elements of the capital-murder charge directly from the indictment, which read as to one count, “the killing of Paul Hughes while engaged in the commission of armed robbery of O.B. Singleton and others,” and as to the other count, “the killing of James Campbell while engaged in the commission of armed robbery of Pat Bolton and others.” Rowland, 98 So.3d at 1038 (¶¶ 11-12). In short, the Rowland Court inadvertently elevated underlying facts—the identities of the victims—which are not to be part of the double-jeopardy analysis to the status of elements of the crime. Culp v. State, 933 So.2d 264, 281 (¶ 58) (Miss. 2005) (“The Blockburger test does not look to the facts adduced at trial but rather focuses on the elements of the offense charged.”).
¶ 40. As applied to the defective-indictment claim at issue today, Rowland not only contradicts the above-mentioned holdings of Batiste and Goff that require only that the underlying felony be named and the corresponding code section be identified, but the Court has invaded the province of the Legislature and created a new element of capital murder. Sinclair v. State, 161 Miss. 142, 132 So. 581, 592 (1931) (“The Legislature has full power to *34 declare and define crime. ...”). In today overruling the part of Rowland that purported to make the identity of the victim of the underlying felony of armed robbery an element of the crime of capital murder, we accomplish two things. We resolve the tension that Rowland created with the line of cases including Batiste and we step back from an unconstitutional encroachment on the power of the Legislature to define the crime of capital murder.
¶41. As for Carson’s argument that Rowland mandates reversal due to the potential of a double-jeopardy violation, Rowland easily may be distinguished. The issue in Rowland was whether the State had violated Rowland’s right to be free of double jeopardy by convicting him both of capital murder with the underlying offense of armed robbery and of committing the armed robbery that served as the predicate felony for the capital-murder conviction. Rowland, 98 So.3d at 1033 (¶ 1). In reaching its holding, that such multiple convictions did violate Rowland’s protection against double jeopardy, the Rowland Court created a new element of the crime of capital murder with the predicate felony of armed robbery—the identity of the victim or victims of the armed robbery. In any event, Carson places only one conviction at issue in the case sub judice. The State is not in fact charging Carson with a count of armed robbery in addition to that count which undergirds the capital-murder charge. Unlike Carson’s case, Rowland actually alleged a double-jeopardy violation.
¶ 42. Carson does not claim a present-day double-jeopardy violation, but he will be well-enabled by the wording of the indictment to plead double jeopardy should the State try to convict him of the armed robbery of Ortiz in the future. Count I of the indictment identifies Ortiz as the victim of the capital murder. Nowhere has a cogent argument been advanced that, should the State return an indictment against him for the armed robbery of Ortiz, thereby putting him in the same position as the defendant in Rowland, he could not cite the language of his indictment to plead double jeopardy. Unlike Rowland, no amorphous “and others” language is to be found in Carson’s indictment.
¶43. Carson does not so substantively attack Count III of his indictment, which charged him with conspiracy:
And, based upon a series of acts connected together and constituting parts of a common scheme and plan, [Carson], ... did conspire with Edward Clay and Bobby Allen to willfully, feloniously, and knowingly commit the crime of Armed Robbery, in violation of Miss. Code Ann. § 97-3-79[ ] (1972, as amended), thereby violating Miss. Code Ann. § 97-1-1 (1972, as amended).
However, he does argue that the failure to name the victim of the crime of conspiracy renders it facially defective because he was not “given sufficient facts to fairly inform him of the charges against which he had to defend and to enable him to plead double jeopardy in the event that Carson is later prosecuted for the crimes.” Carson fails to cite authority for this argument. However, Sanderson v. State, 883 So.2d 558, 560-61 (Miss 2004), is directly on point.
¶ 44. Like Carson, Sanderson challenged his conspiracy conviction on the ground that his indictment failed to name the victim of the conspiracy. Id. at 560 (¶8). The Court of Appeals agreed with Sanderson, but, on writ of certiorari, we reversed its decision because the name of the victim of a conspiracy is not an element of the crime of conspiracy. Id. As of today, the definition of the crime of conspiracy has not changed to require the name of a victim. Miss. Code Ann. § 97-1-1 (Rev. 2014).
*35 ¶45. Although in his dissent Justice Kitchens discusses whether the indictment provided sufficient notice, Carson does not raise the issue. Accordingly, we decline to address it. Miss. R. App. P. 28(a)(7).
CONCLUSION
¶ 46. We hold that, while Carson’s attorney should have requested an accomplice-testimony instruction, Carson has failed to demonstrate a reasonable probability that the result of the proceeding would have been different had the instruction been granted. The court did not err in denying Carson’s proposed D-6 instruction. We affirm Carson’s conviction and sentence.
¶ 47. COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT THE POSSIBILITY OF PAROLE OR PROBATION OR ANY OTHER FORM OF EARLY RELEASE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF CONSPIRACY TO COMMIT ARMED ROBBERY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCES IN COUNTS II AND III SHALL RUN CONSECUTIVELY. THE SENTENCES IN COUNTS II AND III SHALL RUN CONCURRENTLY WITH THE SENTENCE IN COUNT I. APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $995.50; HOWEVER, COURT COSTS, FEES AND ASSESSMENTS ARE HEREBY WAIVED.
WALLER, C.J., RANDOLPH, P.J., LAMAR, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., SPECIALLY CONCURS WITH. SEPARATE WRITTEN OPINION. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.

. The facts are according to the trial testimony of Edward Earl Clay, Carson's alleged accomplice.