# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00458-COA

**AARON DESHUN JONES A/K/A AARON JONES**          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/17/2019 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/28/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., TINDELL AND McDONALD, JJ.

### TINDELL, J., FOR THE COURT:

¶1. A Forrest County jury convicted Aaron Jones of first-degree murder for the death of Frank Jenkins (Count I) and attempted armed robbery (Count II). The Forrest County Circuit Court sentenced Jones to life imprisonment for murder and to serve a consecutive twenty-five-year sentence for attempted armed robbery, with both sentences ordered to be served in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Jones argues his trial attorneys provided ineffective assistance by failing to request a cautionary jury instruction on accomplice testimony. Finding no error, we affirm.

**FACTS**

¶2. Shortly before 10 p.m. on November 21, 2016, Charles Beasley heard a knock at the front door of the Hattiesburg home he shared with his brother, Jenkins. Beasley testified that it took him a few minutes to respond to the knock because he recently had undergone knee-replacement surgery. Beasley turned on the front-porch light and looked outside. He saw a man leaning on his brother's truck and thought someone had come to see Jenkins. According to Beasley, when he unlocked the front door, two young men, perhaps in their twenties, rushed into the house and threatened to kill him if he did not give them money. Beasley initially struggled with the men over a handgun that one of them held, but then he slipped and fell to the floor.

¶3. Beasley testified that the two intruders twisted his arm behind his back and began stomping on him and kicking him. Beasley believed the men had mistaken him for Jenkins. Beasley testified that Jenkins kept money in his pockets, and the two men demanded that Beasley give them the money he had in his pants pockets. Beasley stated that the intruders tore his pants off and began searching the pockets for money. The men continued to threaten Beasley's life if he refused to give them money, and one of the intruders shot Beasley in the leg.

¶4. Beasley testified that Jenkins, who was also at home, heard the commotion and entered the room. Jenkins began shooting at the intruders, and they ran into the den. Beasley testified that the man who had been outside leaning on Jenkins's truck entered the home and

shot Jenkins in the leg. Jenkins tried to retreat down the hallway but was unable to do so because of his injured leg. After Jenkins slid onto the floor, the man who had shot Jenkins approached him and, standing directly over Jenkins, shot Jenkins two or three more times. Beasley testified that the shooter then told the other two intruders that it was time to leave. As they fled the home, the intruders left behind the gun they had used to shoot Beasley.

¶5.     After the intruders left, Beasley called 911. Beasley testified that Jenkins was still alive at that time but that his voice sounded very weak. Emergency personnel arrived and transported the brothers to the hospital, where Jenkins later died. The forensic pathologist who performed Jenkins's autopsy testified that Jenkins died from multiple gunshot wounds to his chest and his leg.

¶6.     Beasley testified that he got a better look at the two men who first entered the house because neither man's face was covered. Beasley stated that his view of Jenkins's shooter was not as clear, though, because he was already on the floor when the third man entered the home and shot Jenkins. Beasley later identified the man who had shot him from a photo lineup. That man, Virgil Luckett, eventually pled guilty to shooting Beasley.

¶7.     Detective Jeremy Dunaway with the Hattiesburg Police Department investigated the shooting. During the course of his investigation, Detective Dunaway received a Crime Stoppers' tip that identified Jones as a suspect in the shooting. After Jones waived his *Miranda*[1] rights, Detective Dunaway interviewed him. At the time of the shooting, Jones

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

resided at his grandmother's house. Jones denied any involvement in Jenkins's death, and he told Detective Dunaway that he had been at his grandmother's house when the shooting occurred. Jones claimed he had remained at his grandmother's house from the afternoon of November 21, 2016, until about 2 a.m. the next morning. The police attempted to verify Jones's alibi, but they were unable to find any evidence to establish that Jones was actually at his grandmother's house at the time of the shooting. Further, Jones's grandmother told the police that Jones had left her home on the afternoon in question and that she had not seen him again until about 2 a.m. the following morning.

¶8.     Detective Dunaway also interviewed Fate Santee, who identified Luckett as another possible suspect in the shooting. Initially, Luckett denied any involvement and provided the police with an alibi. In checking Luckett's alibi, however, the police discovered phone conversations and text messages between Luckett and Santee that confirmed Luckett was not where he claimed to have been at the time of the shooting. During a follow-up interview, Luckett admitted his involvement in the shooting, and he named Jones as the person responsible for shooting Jenkins.

¶9.     The State called Luckett as a witness at Jones's trial. Luckett confirmed that he had pled guilty to second-degree murder and to attempted armed robbery for his part in the events that led to Jenkins's death. Luckett stated that he had participated in the attempted armed robbery along with David Jones (David), Carlos Sibley, and Jones. According to Luckett, David knew that Jenkins kept money at his house, and David was the one who devised the

4

plan to rob Jenkins. Luckett testified that he and the other three men drove to Jenkins's home together. Jones, Luckett, and David exited the car. Luckett testified that Jones was in front of him and that David was behind him as they reached Jenkins's front door. Luckett further testified that after Beasley opened the door, Jones shoved his way into the residence, pushed Beasley to the floor, and told Beasley to stay on the ground. Luckett stated that Jenkins then approached from the back of the house and began firing at them. According to Luckett, he had an assault rifle in his possession, and Jones had a .357 revolver. Luckett testified that Jones shot at both Beasley and Jenkins and that he (Luckett) also began shooting. Luckett stated that Jones shot Jenkins and that Jones then stood over Jenkins and fired one final shot at Jenkins's prone body.

¶10. On cross-examination, one of Jones's attorneys questioned Luckett about inconsistencies between Luckett's pretrial statement to the police and his trial testimony. Luckett admitted that he originally told the police he did not know who had shot Jenkins. After further questioning, however, Luckett told the police that Jones had shot Jenkins. Luckett stated that the version of events he had testified to at trial was the truth and was the same version of events he had eventually provided to law enforcement following his arrest.

¶11. After identifying Sibley as another individual involved in the shooting, Detective Dunaway interviewed him as well. Sibley admitted to participating in the crime, and he told Detective Dunaway that he had driven with the three other men to Jenkins's home. Like Luckett, Sibley informed Detective Dunaway that Jones had shot Jenkins with a revolver

5

during the commission of the crime.

¶12. At trial, Sibley, who had pled guilty to second-degree murder for his involvement in Jenkins's death, corroborated Luckett's testimony that David had come up with the idea to rob Jenkins. According to Sibley, David had picked up him, Jones, and Luckett and had "told [them] about a robbery" before they all drove to Jenkins's home. Sibley testified that the other three men got out of the car while he remained inside the car. Sibley corroborated Luckett's testimony that Jones had a .357 revolver in his possession and that Luckett had a .22 rifle in his possession when the men entered the home. Sibley stated that he heard shots being fired inside Jenkins's home. When the other men returned to the car, Jones asked Luckett why Luckett had dropped his gun. Sibley stated that Jones had paid for the gun and had told Luckett that he would have to repay him (Jones) for the weapon. Sibley further stated that David then drove to a gas station to get gas, and then David dropped off Luckett and Sibley. Sibley testified that he was later arrested and provided a statement to the police. He admitted that his statement to the police in 2016 was not the same as his testimony at Jones's trial. He further admitted that although he had pled guilty to second-degree murder, he had not yet been sentenced.

¶13. Detective Dunaway testified that David, who did not testify at Jones's trial, contacted the police himself and confessed his involvement in the shooting. David told Detective Dunaway that his vehicle had been used in the crime. Detective Dunaway testified that David also told him that Jones had shot Jenkins with a revolver. After the shooting, David

stated that he took everyone home and then returned home himself.[2]

¶14.   Using the information he had collected, Detective Dunaway obtained video footage from a Junior Food Mart gas station and interviewed the gas-station clerk who had worked the night of the shooting.  The clerk remembered seeing David come into the store that night.  The gas station's surveillance video showed David's vehicle arrive at the gas station on the night in question.  The video further showed David exit the vehicle, walk into the store, and return to the vehicle a short time later.  The vehicle then left the gas station and headed in the direction of Luckett's residence.  Detective Dunaway determined that the video footage from the gas station was consistent with the statements David, Luckett, and Sibley had given to him regarding their movements after the shooting.

¶15.   Detective Dunaway also obtained and reviewed video footage from an apartment complex where David and Sibley resided.  Jones resided several blocks away.  Detective Dunaway testified that the footage from the apartment complex showed a subject (whose build, appearance, and clothing matched Jones's description on the night of the shooting) walk across a courtyard while carrying what appeared to be a bag.  Detective Dunaway further stated that the person "proceeded to the front entrance and exited the complex and was last seen walking away on foot."  According to Detective Dunaway, the time shown in the video footage aligned with the time that David would have dropped off Jones after the

_____

[2] At trial, Jones's attorney made no objection to the admission of David's statements through Detective Dunaway's testimony, and no assignment of error regarding this issue is raised on appeal.

7

shooting.

¶16. After considering all the testimony and evidence, the jury found Jones guilty of both first-degree murder and attempted armed robbery. The circuit court sentenced Jones to life imprisonment for the murder conviction and to a consecutive twenty-five-year sentence for the attempted-armed-robbery conviction, with both sentences to be served in MDOC's custody. Jones filed an unsuccessful motion for a judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, he appeals.

**DISCUSSION**

¶17. Jones contends he was entitled to a cautionary jury instruction on accomplice testimony because the State's case against him rested solely on uncorroborated accomplice testimony. Jones argues his attorneys' failure to request such an instruction amounted to deficient legal performance that prejudiced the outcome of his trial. Jones therefore asks this Court to reverse his conviction and to remand his case for a new trial.

¶18. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Swinney v. State*, 241 So. 3d 599, 613 (¶58) (Miss. 2018). "However, a claim of ineffectiveness may be raised on direct appeal 'if such issues are based on facts fully apparent from the record.'" *Carson v. State*, 212 So. 3d 22, 27 (¶18) (Miss. 2016) (quoting M.R.A.P. 22(b)). Because both parties contend that Jones's ineffective-assistance claim is based strictly on facts that are fully apparent from the record, we address the merits of his claim.

8

¶19. To establish ineffective assistance, a defendant must show that (1) his attorney's performance was deficient and that (2) the deficiency prejudiced his defense. *Swinney*, 241 So. 3d at 613 (¶59). "[A] strong presumption [exists] that counsel's performance falls within the range of reasonable professional assistance." *Moore v. State*, 287 So. 3d 189, 194-95 (¶14) (Miss. 2020) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). We often recognize that "the challenged act or omission might be considered sound trial strategy." *Swinney*, 241 So. 3d at 613 (¶60). As a result, "defense counsel is presumed competent, and even where professional error is proven, the Court must determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.*

¶20. We must first determine whether Jones's trial attorneys provided reasonably effective assistance. With regard to cautionary accomplice jury instructions, the Mississippi Supreme Court has explained:

> The clear law in the State of Mississippi is that the jury is to regard the testimony of co-conspirators with great caution and suspicion. When determining whether a defendant is entitled to a cautionary instruction to this effect, the trial judge considers: (1) whether the witness was in fact an accomplice and (2) whether the witness's testimony was corroborated. Although the decision to grant a cautionary instruction about the testimony of an accomplice ordinarily is within the trial judge's discretion, this instruction is mandatory when the accomplice's testimony is the sole basis for the conviction and when the defendant's guilt is otherwise not clearly proven.

*Carson*, 212 So. 3d at 27-28 (¶19) (citations and internal quotation mark omitted). Thus, "the defendant's *entitlement* to a cautionary accomplice jury instruction hinges upon the existence

9

of corroboration." *Jones v. State*, 203 So. 3d 600, 611 (¶33) (Miss. 2016) (citing *Williams v. State*, 32 So. 3d 486, 491 (¶17) (Miss. 2010)). "The testimony that must be corroborated is the part connecting the defendant to the crime." *Id.* at 606 (¶11) (citation omitted).

¶21. No dispute exists that Luckett, Sibley, and David constituted accomplices as defined by Mississippi caselaw. We define an "'accomplice' as 'a person who is implicated in the commission of a crime.'" *Lloyd v. State*, 237 So. 3d 833, 837 (¶15) (Miss. Ct. App. 2017) (quoting *Brewer v. State*, 725 So. 2d 106, 124 (¶84) (Miss. 1998)). Here, Luckett and Sibley both testified that they had already pled guilty to their involvement in the events leading up to Jenkins's death, and Detective Dunaway testified that David had turned himself in to the police and had admitted his participation in the crime.

¶22. Further, as Jones asserts in his appellate brief, the State relied solely on accomplice testimony to directly establish his involvement in the crime. The State's case against Jones rested on Luckett's and Sibley's trial testimony and on David's pretrial statements to the police, about which Detective Dunaway testified. The State did not present any non-accomplice testimony that directly connected Jones to the attempted armed robbery or identified him as Jenkins's shooter. As a result, we can discern "no strategic explanation for forgoing a jury instruction that would have discredited [Luckett's and Sibley's] testimony." *Id.* We therefore find that Jones's trial attorneys provided constitutionally deficient performance by failing to request a cautionary jury instruction on accomplice testimony.

¶23. We do not additionally hold, however, that Jones has demonstrated that his attorneys'

10

deficient performance prejudiced his defense. As discussed, "even where professional error is proven, the Court must determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Swinney*, 241 So. 3d at 613 (¶60). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Lloyd*, 237 So. 3d at 838 (¶17).

¶24. Here, the jury heard Detective Dunaway's testimony about his investigation —beginning with the Crime Stoppers' tip that provided Jones's name as a possible suspect and ending with the video footage that showed a man matching Jones's description leaving David's and Sibley's apartment complex after the shooting occurred. Detective Dunaway testified that Jones lived near the apartment complex and that the video footage corroborated the statements David, Luckett, and Sibley all provided about the group's movements after the shooting. Detective Dunaway further stated that the police were unable to verify Jones's claim that he had been at his grandmother's home at the time of the shooting. And in direct contradiction to Jones's assertions, his grandmother reported to the police that Jones had left her home on the afternoon of the shooting and that she had not seen him again until 2 a.m. the following morning.

¶25. Detective Dunaway also testified that David, who had voluntarily turned himself in to the police and confessed his part in Jenkins's death, had identified Jones as Jenkins's shooter. At trial, both Luckett and Sibley also testified to Jones's involvement, and like David, Luckett identified Jones as Jenkins's shooter. In addition, Luckett and Sibley both

11

testified about their own involvement in the crime, and Sibley testified that his future sentence was based on his truthful in-court testimony. Based on Luckett's and Sibley's testimony about their own involvement in the crime, as well as Sibley's admission that he had not yet been sentenced, the jury could certainly deduce that both men might lie and that Sibley, at least, possessed an incentive to lie at trial. Even so, the jury found Jones guilty of both Jenkins's murder and attempted armed robbery, and as our caselaw clearly holds, "the jury is the sole judge of the weight and worth of evidence and witness credibility." *Williams v. State*, 285 So. 3d 156, 160 (¶17) (Miss. 2019). Upon review, "[w]e do not conclude that a reasonable probability exists that the result [of Jones's trial] would have been different with an accomplice-testimony instruction." *Carson*, 212 So. 3d at 28 (¶21). We therefore find no error.

## CONCLUSION

¶26. Although we agree that Jones's trial attorneys provided deficient performance by failing to request a cautionary accomplice jury instruction, we conclude that Jones has failed to show any resulting prejudice to his defense. We therefore affirm Jones's convictions and sentences.

¶27. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J, NOT PARTICIPATING.**

12