GREENLEE, J., DISSENTING:
 

 ¶ 52. McCarty appeals her conviction in Attala County Circuit Court of manslaughter for backing over her husband Joel in their home's driveway. The majority affirms the circuit court's decision. The majority reasons that there was sufficient evidence to convict Grace of murder and manslaughter; the jury's verdict was not against the overwhelming weight of the evidence; the trial judge did not abuse his discretion by not declaring a mistrial; and the mistake in the jury instructions does not rise to the level of plain error or a manifest miscarriage of justice. I respectfully disagree and therefore dissent.
 

 FACTUAL BACKGROUND
 

 ¶ 53. On the evening of Sunday, November 2, 2014, Grace, Patricia (Grace's ten-year-old daughter), Joel (Grace's husband), and Jay (Joel's son) were at Joel and Grace's home. Joel's Chrysler PT Cruiser was parked in the driveway beside their home. Grace and Patricia got in the car to back out of the driveway. Joel sat down, cross-legged, behind the car before it backed up. As Grace backed the car, Joel was hit-the car running over Joel. Grace stopped the car, exited (as did Patricia), and attempted to render aid to Joel. Patricia began screaming. Jay ran from the front of the house to where Joel lay and began yelling and asking what had happened. Patricia continued to be upset and protective of her mother, telling Jay to "get away from her" as he approached. Grace immediately called 911 requesting assistance and imploring them to come quickly, as she attempted to calm Patricia and deal with Jay. After the ambulance arrived, Joel was taken to an area hospital where he died from his injuries. Later that evening, Grace was taken into custody for driving without a valid driver's license.
 

 ¶ 54. The following morning while in jail, Grace met with Detective Hill of the Kosciusko Police Department, who was investigating the incident. After waiving her
 
 Miranda
 

 [12]
 
 rights, Grace told Detective Hill that she and Patricia were leaving the house because Joel was in a drunken, emotional state and Joel was arguing with his son Jay. She stated that she was trying to get herself and Patricia away from Jay's and Joel's agitated states. She also stated that at no time did she ever see anyone else outside of the house, nor did she ever know that Joel was behind the car. Grace told Detective Hill of security cameras in operation at the house and offered to go with him to the house to view the footage. After viewing the footage, Detective Hill took possession of the "system and entire monitors," which included a secure digital (SD) card containing the footage. Ten-year-old Patricia also met with Detective Hill the same day.
 

 ¶ 55. Detective Hill experienced trouble in scheduling an interview with Jay. He managed to interview Jay almost three months after the incident. That interview occurred after police reports and surveillance footage concerning the incident were obtained by Jay and Joel's extended family. The details of Jay's statements to Detective Hill were not in the record.
 

 ¶ 56. This case was presented to the Attala County grand jury, which returned an indictment for Grace for second-degree murder in violation of
 Mississippi Code Annotated section 97-3-19(1)(b) (Rev. 2014). The case proceeded to trial.
 

 TESTIMONY
 

 ¶ 57. Grace's testimony corroborated her prior statements to Detective Hill. Patricia testified that she "didn't see anybody" outside, except for Jay on the sidewalk in front of the house, but that she did not see him until they were "backing out." When asked if she ever saw Joel come outside, she said,"No, sir." When asked for the first time she saw Joel, she said, "Whenever we backed over him."
 

 ¶ 58. Jay, the deceased's son, was not related to either Grace or Patricia. Along with Joel, Grace, and Patricia, Jay was at the house that evening. His testimony alone challenged Grace's and Patricia's. Jay's mental capacity has been impaired because of a prior accident.
 

 ¶ 59. At the pretrial-motion hearing, Grace moved to challenge Jay's competency to testify at trial. Some years prior, Jay was involved in an automobile accident. In describing his abilities post-accident, Jay testified:
 

 It messed my mind up a good little bit but my mental doctor sent me to-it was some kind of special school that I had to go to [sic] learn to read and some rehabilitation like that. I could remember certain things but somebody really got me riled up or something I would forget it real quick. And they got me on medicine to keep me calm like that.
 

 The trial court found Jay competent to testify based on his "ability to recall the events of the night in question." Jay also testified during trial to his cognitive disabilities, saying that when his heart rate speeds up and he gets excited, that triggers his memory loss. Jay also testified, "I have to keep my pen and notebook for certain things, you know. If I think it is serious I make a note. And every night before I go to bed I get my notebook out and see what happened ...." But when asked if he wrote down anything from the night of the incident, he said, "No sir. Certain things stick, like what happened to Daddy I do remember certain things, you know."
 

 ¶ 60. At trial, Jay testified that it was Grace and Joel that were arguing that evening both inside the house and outside in the front, and:
 

 I don't know what they were arguing about, but Ms. Grace was going to leave and go somewhere. And he said he wasn't going to let her take his car to go nowhere that he would take her somewhere or he would make a call for somebody to come pick her up. And they were arguing and they were standing out there in front of the house and they kept arguing something. And I started-Daddy said, "Go back inside. It will be all right, Jay."
 

 After an objection, Jay was asked if he said Joel and Grace were having an argument about her taking the car. He continued:
 

 Well, I don't know what they were-I thought that's what it was because she was getting in the car wanting to go somewhere. I don't know if they got in an argument before that or what but that's what he said that she wasn't taking the car nowhere. He could call somebody to come get her or something because he said, "That's the only vehicle I got right now and you're not taking it."
 

 ....
 

 Ms. Grace was in the car and Daddy had walked up-there's a hill going up the driveway and about middle ways of the hill there is a crack going across the driveway. And that's where Daddy, he sat down across the crack. And I walked around and I told him, "Daddy don't do
 this crap." I said, "Get up and come back in or whatever." And he said, "No. No. Go in. It is all right, Jay. We are arguing about this and whatever." And I went to go back in the house and about-there is a walkway that goes down the driveway and then it turns and goes to the other side of the house and you can't see what's going on. And I heard the tires on the car. And I turned around to go back and she had hit him. And about that time I heard the lump but I didn't see it.
 

 Jay later testified, "I can't remember real good. I keep thinking and thinking about it but I can't bring around exactly how it happened and I don't want to lead y'all wrong."
 

 ¶ 61. When asked how many times Jay had talked about what happened that night with other McCarty family members, specifically his brother and uncle, he testified, "A good little bit. Because-a good bit. Because I would ask him, like I say, I'm really forgetful. Like he would tell me something and I would leave the room and a couple of minutes later and come and say explain that to me. I would start repeating what he said. I would say, see, I just lost it again. Tell me again exactly what happened, what you said happened."
 

 ¶ 62. Toward the close of Jay's testimony, he reiterated, "I'm trying to remember exactly how it happened. The more I think about it the more it makes my mind [sic] because I get madder and madder that I can't remember exactly."
 

 SURVEILLANCE VIDEO
 

 ¶ 63. The surveillance footage shown to the jury was from a camera on the driveway side of the house pointed up the length of the driveway toward the street. According to testimony, the video footage showed two moments discrete in time: when the car containing Grace, Jay, Joel, and Patricia pulled into the driveway returning home from earlier in the day, interrupted by blank video, and then it showed the moment the car struck Joel. However, the only video footage found in the record is an approximately thirty-three-second clip of when the car driven by Grace began to back out of the driveway, running over Joel.
 

 ¶ 64. The video found in the record begins with the moment the car starts backing up-Grace and Patricia inside, windows up, and Joel visible seated cross-legged directly behind the vehicle, in the vehicle's blind spot. As the car backed up the hill out of the driveway, Joel began to get up in attempt to get out of the way. The car knocked Joel down and ran over him. Grace decelerated after the first thump stopping the car. She and Patricia got out and went to Joel. The video shows Jay then running over from the front of the house after Grace and Patricia are already out of the car.
 

 ¶ 65. In the accompanying audio, outside of an incognizable sound at the start of the video, the following is audible: the vehicle's engine running as it is given gas to back up the hill, a thud from the back wheel as it runs over Joel, the engine decelerating at the first thud, the second thud as the front wheel runs over Joel, Patricia screaming inside the car immediately after Joel is hit and after she and Grace exit the car, Jay yelling incognizably, and Patricia imploring Jay to "leave her alone."
 

 ¶ 66. Detective Hill testified that his reports indicated that he saw footage from a camera that looked directly at the front porch and that he saw a "disco ball" hanging from the porch awning. But Detective Hill then testified that his prior report was mistaken and that he must have been thinking of a photo he had taken of the
 same area with the same disco ball in the frame.
 

 ¶ 67. Grace testified concerning what she saw while watching the video at her house with Detective Hill. According to Grace, the video showed "my daughter running down the sidewalk. I hear me saying 'run, run, run' and then the doors are still open on the car even. I guess-the doors are open, like we open doors up, and you could see in the video that Joel comes running out and sat down behind my car. He squatted his legs and he sat."
 

 ¶ 68. Kendall Blaylock testified on behalf of the State as an expert in computer forensics regarding the surveillance footage. Blaylock partially addressed the abrupt beginning of the video-camera footage that was shown to the jury. Blaylock testified that there were two camera views recorded on the SD card for the surveillance system: one along the side of the house looking up the driveway toward the street, and the other viewing the "front walk" of the house. Blaylock testified, however, that only footage from the driveway view was found on the SD card for the day of the incident. Blaylock testified that the camera looking at the front of the house last recorded to the SD card on October 31, and for no explicable reason, it stopped recording to the SD card after that date. He testified that video files had been deleted from the SD card, stating that those deletions looked to be in the "normal operation of the system[.]" Blaylock also testified that "there were some files that I'm not able to put a date on, but those didn't look to come from that time either." Blaylock testified that he wanted to look at the actual computer itself and not just the SD card because
 

 [e]ven if it was recording straight to the SD card, I would want to be able to look at the computer because you may be backing up archive videos to the computer. You know, just like backing up pictures from a camera, I may want to save those to my computer at some point. The other thing is the potential or something recording straight to a computer, I may want to be able to see that. Any time, honestly, you know, if I saw a computer sitting next to other digital equipment, I would want to see what was on the computer.
 

 Blaylock further testified that he never had access to the actual computer and that there was no way for him to know if there was footage from the surveillance system stored directly on the computer.
 

 JURY'S INSTRUCTIONS AND VERDICT
 

 ¶ 69. Among the jury instructions given was Instruction 5 (S-2), which instructed the jury that, should it find the State failed to prove that Grace was guilty of second-degree murder, then it should proceed with deliberations on the lesser-included offense of manslaughter. The instruction describes two kinds of manslaughter: heat-of-passion manslaughter and culpable-negligence manslaughter. Particularly troubling, the section on culpable-negligence manslaughter read as follows:
 

 The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, Grace Ann McCarty a/k/a Grace Ann Woods a/k/a Grace Ann Proctor, on or about November 2, 2014, in Attala County, Mississippi, killed Joel McCarty, a human being, without authority of law and by
 
 his
 
 culpable negligence, then the defendant is guilty of Manslaughter and it is your sworn duty to so find.
 

 (Emphasis added).
 

 ¶ 70. The jury returned its verdict and found Grace "guilty of manslaughter." Grace moved for a judgment notwithstanding
 the verdict and a new trial, both of which were denied, and she timely appealed to this Court.
 

 ¶ 71. The jury did not state under which theory of manslaughter they found Grace guilty, nor did the trial court inquire into such; however, the "Notice of Criminal Disposition" from the trial-court clerk's office stated that Grace was sentenced under Mississippi Code Annotated section 97-3-47 (Rev. 2014), the culpable-negligence-manslaughter statute.
 

 DISCUSSION
 

 ¶ 72. Grace's appeal argues that (1) the evidence was insufficient, (2) the verdict was against the overwhelming weight of the evidence, and (3) the trial court abused its discretion in denying her motion for a mistrial.
 
 [13]
 

 ¶ 73. The majority affirms the jury's verdict, finding that there was sufficient evidence to convict Grace of murder or manslaughter; that the jury's verdict finding Grace guilty of manslaughter was not against the overwhelming weight of the evidence; and that the error in the jury instruction did not constitute plain error or a manifest miscarriage of justice.
 

 ¶ 74. However, the trial court improperly instructed the jury on culpable-negligence manslaughter focusing the jury on "
 
 his
 
 culpable negligence," but not her culpable negligence, which is plain error. Further, the evidence for the jury's verdict is insufficient for heat-of-passion manslaughter, and due to the lack of evidence presented and its conflicting nature, allowing the jury's verdict for culpable-negligence manslaughter to stand would sanction an unconscionable injustice. Therefore, I respectfully dissent.
 

 ¶ 75. Due to the plain error in instructing the jury, this case should be reversed and remanded. It is unclear which manslaughter the jury found Grace guilty of committing, heat-of-passion manslaughter or culpable-negligence manslaughter. Though the improper jury instruction is plain error, for which the unspecified verdict should be reversed and remanded, a discussion of the evidence presented for heat-of-passion and culpable-negligence manslaughter remains warranted.
 

 I. Culpable-Negligence Manslaughter
 

 ¶ 76. Mississippi Code Annotated section 97-3-47 states that "[e]very other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter." Culpable negligence is defined as "the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of the wilful creation of an unreasonable risk thereof."
 
 Chandler v. State
 
 ,
 
 946 So.2d 355
 
 , 361 (¶ 22) (Miss. 2006). The supreme court has also defined culpable negligence as "such gross negligence as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness."
 

 Id.
 

 (quoting
 
 Shumpert v. State
 
 ,
 
 935 So.2d 962
 
 , 967 (¶ 14) (Miss. 2006) ).
 

 a. Jury Instruction
 

 ¶ 77. A review of the jury instruction for culpable-negligence manslaughter reveals that the jury was instructed to determine Grace's guilt or innocence based on "
 
 his
 
 culpable negligence," that being Joel's, not Grace's. (Emphasis added).
 

 ¶ 78. The majority admits that this jury instruction was in error, but finds that it does not rise to the level of plain error and that the issue is procedurally barred because it was not objected to at trial nor raised on appeal. However, the instruction given to the jury created "plain error" and, therefore, the court may review the record and address the unpreserved issue on appeal."
 
 Lafayette v. State
 
 ,
 
 90 So.3d 1215
 
 , 1220 (¶ 18) (Miss. 2012). "To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial."
 

 Id.
 

 Here, the legal rule involved is that the jury instructions, when read together, must "convey the law of the case and create no injustice ...."
 
 Carson v. State
 
 ,
 
 212 So.3d 22
 
 , 28 (¶ 22) (Miss. 2016). To do otherwise is reversible error.
 

 Id.
 

 ¶ 79. Here, "[t]he statutory elements of culpable-negligence manslaughter are an unlawful killing by the culpable negligence of another."
 
 Gebben v. State
 
 ,
 
 108 So.3d 956
 
 , 968 (¶ 34) (Miss. Ct. App. 2012) (internal quotations omitted). Thus, "[t]he causation element is present in this definition-the unlawful killing must be a result of the
 
 defendant's
 
 culpable negligence."
 

 Id.
 

 (emphasis added). Therefore, the trial court's instructions to the jury must have contained, in some form, that Grace's culpable negligence caused Joel's death. However, instruction 5 (S-2) required the jury to find Grace guilty of culpable-negligence manslaughter by "
 
 his
 
 [ (Joel's) ] negligence" (emphasis added). This resulted in plain error. "Failure to instruct the jury on the essential elements of the crime is plain error."
 
 Wordlaw v. State
 
 ,
 
 218 So.3d 768
 
 , 769 (¶ 8) (Miss. Ct. App. 2017).
 

 ¶ 80. The record reveals that Joel sat cross-legged in the driveway uphill and immediately behind a running automobile, in the middle of the back of the car and in its blind spot, before it backed out. While such behavior by Joel could be described as negligence "of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life," the jury instruction provided the law that Grace could be found guilty of manslaughter based upon Joel's culpable negligence. This equates to a peremptory instruction, requiring the jury to find Grace guilty, if it found that Joel was culpably negligent. Such is an error which is "plain, clear, and obvious," and clearly "prejudiced the outcome of the trial." As such, it is reversible error.
 

 b. Sufficiency and Weight of the Evidence of Culpable-Negligence Manslaughter
 

 ¶ 81. Further, the majority finds that the jury's verdict was not against the weight of the evidence because the State and defense presented conflicting testimony. The majority reasons that as appellate courts, the supreme court and court of appeals "do not make independent resolution of conflicting evidence," but rather "the jury [is] the sole judge of the credibility of witnesses and the weight and worth of their testimony."
 
 Little v. State
 
 , 2014-CT-01505-SCT,
 
 233 So.3d at 292
 
 ,
 
 2017 WL 4546740
 
 , at *4 (¶ 20) (Miss. Oct. 12, 2017). Although I understand the newly clarified standard promulgated in
 
 Little
 
 , I would find that in order to review whether a "a verdict ... is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice" requires the court to evaluate the weight of the entire evidence- which inevitably involves the consideration of witness credibility.
 

 ¶ 82. Upon review, Jay testified but then appeared to simultaneously recant, disqualify, and impeach his own testimony. He testified as to his version of that night,
 but that he really was not sure, could not remember, or did not want to misspeak to the trial court. There was also Jay's impairment at the time of the incident and at trial. He said his impairment causes memory loss when his heart rate speeds up and when he gets excited. The surveillance footage, the recorded 911 call, and the testimony of the first responders suggest that Jay was highly agitated that night. Jay also stated he makes notes in his journal every night of everything important that happened during the day so that he does not forget. Jay testified that he did not make any notes of that night and no entries of that night, were brought into evidence. Jay also testified that he cannot remember what happened; that his brother would have to tell him what happened; and that he would walk off, try to process it, and then go back to his brother and have his brother tell him again how the events occurred because he had forgotten. Yet he testified that he remembered what happened that night because "some things stick."
 

 ¶ 83. It is noteworthy that Jay was not made available for a police interview until after Joel and Jay's extended family acquired the police reports and the surveillance footage.
 

 ¶ 84. As noted by the trial court, Grace maintained that she never even knew Joel was outside, let alone behind the car. She testified that she never saw anyone outside. She testified that it was Jay and Joel arguing in the house that evening and that she was leaving with Patricia to get away from them. She did give different reasons for operating the car to the 911 operator and first responders, but when she talked with Detective Hill she volunteered that her prior stated reasons were not accurate and that she was trying to leave because Jay and Joel were arguing. She stated that she did not state the same to the 911 operator and the first responders "because I was afraid I was not going to be able to go to the hospital because I had no license. I had a suspended license. And I was afraid that if I told them that, I wouldn't be able to make it to the hospital. And I knew he was in really bad shape." Her reasoning appears corroborated because she was indeed arrested for driving with a suspended license while she was at a gas station en route to the hospital with Shay, also Joel's son.
 
 [14]
 

 ¶ 85. Patricia's testimony corroborated Grace's. She testified that Jay and Joel were arguing that night, that she and Grace were leaving the house to get away from them, that she was unaware anyone else was outside until she saw Jay standing in front of the house on the sidewalk as they were backing out, and that she did not know Joel was outside until after she realized they hit him.
 

 ¶ 86. The video found in the record does not impeach Grace or Patricia's testimony, nor does it corroborate Jay's. At the start of the video, the PT Cruiser is backing up with Grace and Patricia inside, windows up, and no one else visible except Joel, who is seated cross-legged directly behind the vehicle and clearly in the middle of the vehicle's blind spot. As the car backs up the hill out of the driveway, Joel attempts to get out of the way. Grace stops the car, and she and Patricia get out and go to Joel. Jay comes running over from the
 front of the house after Grace and Patricia are already out of the car.
 

 ¶ 87. In the accompanying audio, besides an incognizable sound at the start of the video, the following is audible: the engine running as it is given gas, the thuds from both sets of axle-wheels as they hit Joel, the engine immediately stops revving at the first thud, Grace and Patricia get out, Patricia screaming inside the car immediately after Joel is hit and after she exits the car, Jay yelling incoherently, and Patricia yelling "leave her alone."
 

 ¶ 88. The video begins abruptly after blank footage with Grace and Patricia in the car and Joel sitting cross-legged behind it. The failure of the surveillance system to record the scene before then is unexplained.
 

 ¶ 89. According to Grace, when at the house viewing the video with Detective Hill she saw "[her] daughter running down the sidewalk. I hear me saying 'run, run, run' and then the doors are still open on the car even. I guess-the doors are open, like we open doors up, and you could see in the video that Joel comes running out and sat down behind my car. He squatted his legs and he sat."
 

 ¶ 90. Grace testified that after Detective Hill had viewed the video, she was outside with her mother when Detective Hill said "that he didn't feel like this would ever go to trial, it would ever go before the grand jury. It was obvious that I had not, there was no way I could see that he ran-that I ran over him. There was no way you could see it." Grace's mother, Patricia, corroborated Grace's testimony. Grace's mother testified that, while she, Grace, and Detective Hill were in front of the house, Detective Hill said, "it is plain to see that you could not have seen him. That it shouldn't even go before the grand jury." Detective Hill denied making the statement.
 

 II. Heat-of-Passion Manslaughter
 

 ¶ 91. Mississippi Code Annotated section 97-3-35 (Rev. 2014) states that "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel and unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." "Heat of passion" is
 

 a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
 

 Batiste v. State
 
 ,
 
 121 So.3d 808
 
 , 844 (¶ 70) (Miss. 2013) (quoting
 
 McCune v. State
 
 ,
 
 989 So.2d 310
 
 , 319 (¶ 15) (Miss. 2008) ). "[T]he impassioned reaction of the accused must have been reasonable: the passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation."
 
 Abeyta v. State
 
 ,
 
 137 So.3d 305
 
 , 310 (¶ 10) (Miss. 2014). "There must be such circumstances as would indicate that a normal mind would be roused to the extend that reason is overthrown and passion usurps the mind destroying judgment."
 

 Id.
 

 at 310-11
 
 (¶ 10). Additionally, "
 
 words alone
 
 and
 
 disagreements among people
 
 are not enough to invoke the passion required for this defense. Mere words, no matter how provocative, are insufficient ...."
 

 Id.
 

 (emphasis added).
 

 ¶ 92. The majority finds that the State presented sufficient evidence of the essential elements of second-degree murder and
 culpable-negligence manslaughter and, therefore, finds it unnecessary to address heat-of-passion manslaughter. However, and perhaps more interestingly, the trial judge during consideration of the jury instructions stated:
 

 The only manslaughter instruction I honestly see that might be appropriate is culpable negligence because there-I have not seen any or heard testimony that she was enraged or in some kind of heat of passion when she backed over him. I mean, her testimony was that she didn't even know he was there. I don't see how it can possibly be a heat of passion-I'm certainly open to hearing discussion on the issue but my initial thought is how is it a heat of passion? You have got to have her saying that, you know, she was enraged about something that he had done and backed over him. And the only thing she has maintained is she didn't even know he was there at all.
 

 After a review of the colloquy on the jury instructions, it appears the only reason the trial judge granted the instruction on heat-of-passion manslaughter is that neither side objected to giving the instruction and the State's sole reason for requesting it was based on testimony of Joel and Grace's purported "arguing" as heat of passion.
 
 [15]
 

 ¶ 93. Here, there was no testimony that Grace and Joel even physically touched one another that night, let alone during their purported argument. And according to Jay, the argument was possibly about Grace using the car to leave. There was no evidence that Grace was enraged or that passion had usurped her mind. That is insufficient to provide the necessary provocation for heat-of-passion manslaughter because "disagreements among people are not enough" to claim heat of passion. As such, there is no way a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
 

 ¶ 94. There was insufficient evidence to provide the basis for a conviction of heat-of-passion manslaughter. Therefore, the evidentiary weight of the same need not be addressed.
 

 CONCLUSION
 

 ¶ 95. Though not cited as error on appeal, the court's instruction to the jury that Grace could be found guilty of manslaughter because of "
 
 his
 
 [ (Joel's) ] culpable negligence" (emphasis added) created plain error that "caused a manifest miscarriage of justice."
 
 Little
 
 ,
 
 233 So.3d at 299
 
 ,
 
 2017 WL 4546740
 
 , at *10 (¶ 46). Further, considering the evidence presented and its nature as discussed above, allowing the jury's verdict for culpable-negligence manslaughter to stand would sanction an unconscionable injustice. The case should be reversed and remanded because of the plain error in the improper instruction of the jury on culpable-negligence manslaughter. Also, the evidence submitted was insufficient on heat-of-passion manslaughter to uphold a conviction of that crime. Therefore, I dissent.
 

 LEE, C.J., CARLTON AND WESTBROOKS, JJ., JOIN THIS OPINION.
 

 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966).
 

 Because I would find Grace's first two errors dispositive of her appeal, I decline to address her third that the trial court abused its discretion in denying her a mistrial.
 

 Per Detective Hill's testimony, "Captain [Herbert] Due [of the Kosciusko Police Department] advised me that his shift answered a call later at [a gas station] involving Grace Ann McCarty and Shay McCarty. They were having an argument. Captain Due advised me that Grace Ann had admitted to driving to [the gas station] and that her driver's license were [sic] suspended and she was taken into custody for some misdemeanor charges."
 

 Grace's trial counsel initially objected to giving the heat-of-passion instruction, but after an off-the-record conference with Grace, he agreed to it.