# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00247-SCT

*JEFFREY RANDLE*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 10/2/1999 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD BURDINE |
| | MARK ANDREW CLIETT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/15/2002 |
| MOTION FOR REHEARING FILED: | 8/26/2002; denied 10/10/2002 |
| MANDATE ISSUED: | 10/17/2002 |


**BEFORE SMITH, P.J., WALLER AND CARLSON, JJ.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Jeffrey Randle ("Randle") was indicted on April 11, 1997, by a Grand Jury for capital murder in the killing of Willie Mae Sewell ("Sewell") while engaged in the commission of a robbery. Following a trial by jury in the Circuit Court of Clay County, Randle was convicted of capital murder and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections without the possibility of parole. Aggrieved by this ruling, Randle appeals to this Court. As this Court finds no reversible error, the judgment below is affirmed.

## FACTS

¶2. Marsha Doss ("Marsha") routinely took Sewell to pick up her pension and social security checks from the post office on the first and third of every month. Sewell, seventy-nine years of age, did not drive, and Marsha took her to run errands or would pick up things for Sewell. On January 2, 1997, Marsha took

Sewell to pick up her pension check, which Sewell referred to as her "little check." Marsha testified that this check was for approximately $113 or $133, but no more than $150. She stated that she also took Sewell to pick up her larger social security check on January 3, 1997. This check was for approximately $250. Marsha testified that after picking up the check she drove Sewell to the bank so she could cash her "little check." Marsha then drove Sewell to the grocery store, but she testified that Sewell used food stamps for her purchase there and did not spend any cash. From there she drove Sewell home and did not see or talk to her again.

¶3. Estella Doss ("Doss") testified that on January 4, 1997, shortly before 10:30 in the morning she heard a knock on her door as she was making breakfast. Upon looking out the glass, Doss saw Randle, a young man who lived down the street from her. She observed that his shirt was torn and that he appeared agitated. Doss stated Randle told her that just a few minutes earlier he had been at Sewell's home when two men came in and attacked both he and Sewell. Doss called the police, and approximately three minutes later Officer Bobby Lane ("Lane") arrived in her driveway. Lane testified that he arrived at Doss's home at 10:26 a.m., shortly after her call to the police. Doss related to Lane what Randle had told her.

¶4. Lane stated that there was a rip in the front of Randle's shirt and that Randle appeared as if he had been in a fight. Lane testified, however, that he did not observe any marks on Randle. He also stated that Randle was wearing gloves and that he appeared nervous. Randle walked down to Sewell's house, and Lane followed in his vehicle. Lane testified that upon arriving at Sewell's home, Randle told him that he would show Lane where Sewell was. Lane stated he followed Randle through two rooms into the hallway where Sewell was on the floor. Lane related that Sewell was lying face up in the hallway near the bathroom next to a telephone on the floor and that there were bruises around her neck. He testified that while it was warm in the house, Sewell was cold and stiff. Lane stated that other emergency personnel had been called, however, when he stepped outside he happened to see the Clay County Coroner, Alvin Carter, driving down the street. He flagged Carter down and had him come in to check the body. Lane testified that Carter told him Sewell had been dead for several hours. At that time, Lane had Corporal Robert Bell arrest Randle.

¶5. Detective Danny McCaskill arrived at Sewell's home shortly after 10:30 a.m., and began "processing the scene." He observed that there was no forced entry. He stated that while the living room was orderly, there were signs of a struggle in the den with papers strewn about and spots of blood on papers, clothing, the floor and a chair. McCaskill related that he examined Sewell, and observed bruising and ligature marks around her neck, a scar on her cheek, a busted lip and a swollen eye. A hat and a set of dentures, which Randle stated belonged to him, were found near the body. Randle also stated that vomit found near the body was his. McCaskill testified that he found Sewell's purse in her bedroom, but that no money was found in her home anywhere other than some coins that appeared to have fallen in a wastebasket in her bedroom.

¶6. McCaskill stated that later that evening he examined Randle at the police department and observed a slight bump on his forehead and what appeared to be a few fresh, superficial scratches on his right leg. Dr. Edwin Miller also examined Randle shortly after the police had picked him up. He testified that he observed no evidence of trauma, with the exception of a small bump on Randle's forehead.

¶7. On January 5, 1997, Dr. Steve Hayne performed the autopsy on Sewell's body. He classified Sewell's death as a "garrote death," meaning that she was strangled from behind with a rope or cord. Scientists from the Mississippi Crime Lab reviewed evidence from the crime scene. Dana Johnson, a forensic scientist

specializing in serology, testified that she found human blood on the cord found in Sewell's clothing during the autopsy. She also found human blood on Randle's shirt, and other items found in Sewell's home. Joe Andrews, a forensic scientist specializing in micro analysis, testified that he examined the cord found at the autopsy. He also examined the cord from Randle's red jogging pants that he was wearing when he was arrested. Andrews testified that part of the cord from the jogging pants was missing and that the two cords were made of consistent fibers. He also stated that the cord found at the autopsy had red fibers on it consistent with the red jogging pants. He was, however, unable to match the cord as coming from the jogging pants' cord because the end was so frayed as to make it impossible.

¶8. Randle gave two tape recorded statements to Detective Charles Johnson ("Johnson"). The first statement was given on January 4, 1997, at approximately 11:56 a.m. In this statement, Randle stated that he had been drinking and smoking cocaine the night before, and that early the morning of January 4, 1997, he was outside getting ready to rake Sewell's yard when he heard her hollering. He stated that he ran inside and two men were in there attacking Sewell. In the midst of giving the same statement, Randle changed his mind and stated that Sewell's door was open and that he heard a noise and went in to investigate. It was at that time that he claimed two men attacked him. Later, on January 7, 1997, Johnson got a call from the Clay County Jail informing him that Randle wished to speak with him. In this statement, Randle initially continued proclaiming that he was not involved in Sewell's death and that he had been attacked as well. Toward the end of this statement, Randle confessed that he choked Sewell and took money from her. He stated that he only took $13, but admitted that he had $113. At trial, Randle testified that he did not kill Sewell. His story, however, differed each time it was given. He alleged that he confessed to something he did not do because of pressure and coercion.

¶9. The jury returned a verdict on October 1, 1999, finding Randle guilty of the capital murder of Sewell. On October 2, 1999, the jury returned with a sentence of life imprisonment without the possibility of parole. Judgment was entered in accordance with the jury verdict and sentence.

## ISSUES

¶10. Randle raises three issues on appeal. First, he contends that the trial court erred in refusing Jury Instruction DGP-3, which was a directed verdict instruction, and that the trial court additionally erred in denying his motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Randle also contends that the verdict was against the overwhelming weight of the evidence. Second, Randle argues that his verdict and sentence should be overturned due to the State's failure to do DNA testing. Finally, he asserts that the trial court erred in granting Jury Instructions SSP-4B and SSP-5 during the sentencing phase of the trial.

## STANDARD OF REVIEW

¶11. The legal sufficiency of the State's evidence may be tested by a motion for a directed verdict, a request for a peremptory instruction, and a motion for a JNOV. *Ellis v. State*, 778 So.2d 114, 117 (Miss. 2000). This Court views all evidence in the light most favorable to the State and must accept as true all the evidence which supports the guilty verdict without weighing the credibility of the evidence on appeal. *Id.* (collecting authorities). This Court will reverse only where reasonable and fair-minded jurors could only find the accused not guilty. *Wetz v. State*, 503 So.2d 803, 808 (Miss.1987).

¶12. Regarding Randle's argument that the verdict was against the overwhelming weight of the evidence,

"this Court must accept as true evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Collier v. State*, 711 So. 2d 458, 461 (Miss. 1998).

¶13. As to the remaining allegations of error, Randle failed to make these objections at trial, thus this Court need only review these charges for plain error. *Simmons v. State*, 805 So.2d 452, 480 (Miss. 2002). Plain error requires reversal only "when a trial court's error impacts a fundamental right of a defendant." *Id*.

## DISCUSSION

### I. SUFFICIENCY AND WEIGHT OF THE EVIDENCE.

¶14. Randle challenges the legal sufficiency of the evidence, and he maintains that the verdict was contrary to the weight of the evidence. Randle alleges that the most damaging piece of evidence is the confession he gave Johnson on January 7, 1997, and that without the confession the proof would not have been sufficient to support a conviction. There is no merit to this allegation of error. First, Randle sets forth no reason to throw out the confession. Thus, this Court need not turn a blind eye to it when reviewing the evidence below. Second, the jury heard Randle's argument that his confession was coerced, and his assertions that he did not do it. The jury is charged with gauging credibility. *See Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993); *Burrell v. State*, 613 So. 2d 1186, 1192 (Miss. 1993). Clearly, the jury found Randle's story unconvincing.

¶15. A review of the physical evidence below clearly suggests Randle's guilt. First, while Randle alleged that the attack on Sewell and him occurred shortly before he ran to Doss's home, the coroner stated that Sewell had been dead for several hours. While it is true the coroner is not a medical doctor, Lane also testified that while it was warm in Sewell's house her body was cold and stiff suggesting that she had been dead more than just the few short minutes Randle claimed. Second, the physical evidence provides a possible link between a cord found in Sewell's clothing and the cord in Randle's jogging pants. Considering Dr. Hayne's conclusion regarding the cause of death and the verification that human blood was found on the cord found in Sewell's clothing, it is not inconceivable that the cord was the murder weapon. Thus, a link between the cord and Randle is even more crucial.

¶16. Furthermore, Randle told various stories regarding the events and the part that he played in them, ultimately providing police with a confession. He told Johnson that he had $113, which is the same amount that Marsha believed Sewell's pension check to have been. This check that she cashed the day before, out of which she did not spend any cash. Finally, no money was found in her home with the exception of some coins in a wastebasket.

¶17. Miss. Code Ann. § 97-3-19 requires the prosecution to proved that an unlawful killing took place while the person was engaged in the act of robbery. Considering all of this evidence in the light most favorable to the prosecution, it is legally sufficient to support the verdict rendered below, and the verdict is certainly not against the overwhelming weight of the evidence.

### II. FAILURE TO PERFORM DNA TESTING OF THE BLOOD FOUND AT THE CRIME SCENE.

¶18. Randle asserts that his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated by the State's failure to perform DNA testing. Randle did not, however,

request such DNA testing below. The State alleges that Randle did not preserve this issue for appeal, and thus it contends that Randle is procedurally barred from complaining about it on appeal. Randle did not request that DNA tests be performed, and he did not raise the issue of prejudice to him at trial or in his motion for judgment notwithstanding the verdict or in the alternative a new trial. Under these facts, Randle is barred from pursuing this issue on appeal.

¶19. However, as Randle asserts that his constitutional rights have been violated, this Court will review the issue anyway, particularly under the plain error standard. We find that no harm resulted to Randle from the failure to perform DNA testing. First, this Court has not held that DNA testing is a constitutional right. In fact, this Court has found in other cases regarding DNA testing that failure to do testing or inadvertent destruction of evidence prior to testing was not error. *See **King v. State**,* 798 So. 2d 1258 (Miss. 2001); **Coleman v. State**, 697 So. 2d 777 (Miss. 1997). While these cases are not directly on point, they do provide some insight on this issue. *Coleman* involved the failure to do DNA testing, followed by the denial of a defense motion to pay for DNA tests. *Coleman*, 697 So. 2d at 777. This Court specifically stated that "[c]onsidering the expense and time required to conduct DNA testing, we will not require the State to pay for DNA testing where there is no showing that it would significantly aid the defense." *Id*. at 782.

¶20. *King* involved inadvertent destruction of evidence. The police had collected the blood-stained shirt King was wearing when he was picked up. *King*, 798 So. 2d at 1261. The police failed to freeze the shirt, so when testing was done the only determination possible was that the sample found on the shirt was human blood. *Id*. King was charged with the murder of Emma Lou Pitts. *Id*. at 1260. His cell phone had been found in her home, near her body. *Id*. at 1261. Much like Randle, King asserted as his defense at trial that he had been attacked and robbed. *Id*. He asserted that the blood on his shirt was that of his attacker and that his attacker may have killed Pitts. *Id*. He pointed to the fact that the blood that was found in her home did not match Pitts's or his blood type to support his theory of another suspect. *Id.* at 1261.

¶21. This Court reviewed King's allegation that the trial court erred in overruling his motion to dismiss for the failure to preserve this evidence. *Id*. at 1262. This Court stated that

> [T]he State's duty to preserve evidence is limited to evidence that is expected to play a significant role in the defense. To play a constitutionally significant role in the defense, the exculpatory nature of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means.

*Id*. (citing **Banks v. State**, 725 So. 2d 711, 714-15 (Miss. 1997)). A failure to preserve is not alleged in the case at bar, but the situation in the case sub judice is comparable to the error alleged when evidence is not preserved, as the question remains the same: Was it error to fail to present this evidence? Here, we find that the exculpatory nature of the evidence was not necessarily apparent. Randle's counsel questioned McCaskill about why DNA tests were not performed. McCaskill stated that DNA tests are expensive, and they consider carefully whether the performance of such testing is necessary in each case. McCaskill also observed that such testing would have been of little benefit in the case at bar as Randle was wearing gloves when they first saw him, thus any fingerprints found would not likely be his. Further, as Randle testified that he was often in Sewell's house, such evidence could be explained away easily. As to the blood testing, McCaskill and the other witnesses testified that Randle was not bleeding when they first saw him, and thus it is unlikely that any blood at the scene would have been his.

¶22. It is of some import that Randle alleges that two men attacked him. Therefore, if some of the blood did

not match Sewell's, this could have been exculpatory. Thus, we also consider the second prong of this test, which looks to whether comparable evidence was available. It is noteworthy that King and Randle assert a somewhat similar defense, as this Court determined that King did not meet the second prong since he was still able to present his theory of the case to the jury much as Randle was able to.

¶23. *King* also states that "the mere possibility [that] the evidence might aid the defense does not satisfy the constitutional materiality standard." *Id*. at 1263 (citing ***Tolbert v. State***, 511 So. 2d 1368, 1372 (Miss. 1987)). Further, *King* also notes that a "review of the record shows that, at best, this evidence would have only aided King's defense; it was not a necessary element of it." ***Id***. The same is true in Randle's case. As this Court has held, there is no duty on the State "to search out and discover any and all possible exculpatory evidence." ***Campbell v. State***, 437 So. 2d 3, 5 (Miss. 1983). Thus, based on this Court's prior case law and the facts of this case, this Court finds this issue to be without merit.

### III. SENTENCING INSTRUCTIONS SSP-4B AND SSP-5.

¶24. On appeal Randle challenges two sentencing instructions, SSP-4B and SSP-5, given to the jury by the trial court. Randle's counsel specifically stated that they had no objection to these two instructions during trial. Thus, Randle waived any right to complain about these instructions on appeal. This Court, however, will review the instructions complained of in order to fully consider all issues on appeal. The two instructions complained of were both given during the sentencing phase of the trial. Instruction SSP-4B reads as follows:

> The Court instructs the Jury that you have found the defendant guilty as charged of Capital Murder. You must now decide whether the defendant will be sentenced to death or to life imprisonment. In reaching this decision, you must objectively consider the detailed circumstances of the crime for which the defendant was convicted, as well as the defendant himself. Your deliberations should be taken in three steps, and they are listed as follows:
>
> 1. You must first unanimously find beyond a reasonable doubt, in order to return and impose a sentence of death, that one or more of the following conditions exist:
>
> a. The defendant actually killed;
>
> b. The defendant attempted to kill;
>
> c. The defendant intended that a killing take place;
>
> d. The defendant contemplated that lethal force would be employed;
>
> If you unanimously find from the evidence in this case beyond a reasonable doubt that one or more of these conditions exist, then you must proceed to weigh the mitigating circumstances against the aggravating circumstances.
>
> 2. To return and impose a sentence of death, you must unanimously find from the evidence that the mitigating circumstances, those which tend to justify the less severe penalty of life in prison, do not outweigh the aggravating circumstances, those which tend to justify the death penalty. If you unanimously find from the evidence in this case beyond a reasonable doubt that any one or more of the following aggravating circumstances exist:

a. The Capital Murder was committed while the defendant was engaged in the commission of the crime of Robbery;

b. The Capital Murder was especially heinous, atrocious and cruel;

c. The Capital Murder was committed for the purpose of preventing or avoiding a lawful arrest;

d. The Capital Murder was committed by a person under a sentence of imprisonment;

Then you must proceed to weigh against these aggravating circumstances, the following mitigating circumstances:

a. Whether the crime was committed while the defendant was under the influence of extreme mental or emotional disturbances;

b. The age of the defendant at the time of the crime;

c. Any other circumstances which you deem mitigating;

If, after weighing the mitigating circumstances and the aggravating circumstances, the defendant has failed to prove that the mitigating outweighs the aggravating; and you further unanimously find from the evidence that the aggravating circumstances outweigh the mitigating circumstances, and that the death penalty should be imposed, your verdict should be returned on a separate sheet of paper.

[The remainder of the instruction is the verdict form]

Randle argues that this instruction is vague and that it likely confused the jurors on how to weigh aggravating and mitigating circumstances.

¶25. Instruction SSP-5 reads as follows:

The Court instructs the Jury that the term "especially heinous, atrocious and cruel" as used in these instructions is defined as being a conscienceless and pitiless crime which is unnecessarily torturous to the victim.

Randle argues that, by following SSP-4B, this instruction improperly highlights the heinous, atrocious and cruel aggravating circumstance. He further argues that the approved form of this instruction reads "conscienceless, pitiless crime," and that wording "conscienceless and pitiless crime" in the instruction given below amounts to reversible error.

¶26. In reviewing these instructions, it must first be noted that Randle was sentenced to life imprisonment without the possibility of parole. Under Miss. Code Ann. §§ 97-3-21, 47-7-3 and 99-19-101, the only options available for sentencing were death or life without the possibility of parole. *See also **Pham v. State***, 716 So. 2d 1100, 1103-04 (Miss. 1998). With this fact in mind, beyond the procedural bar, there is an additional bar to this allegation of error: Randle was not prejudiced by the granting of these instructions because he got the best possible sentence. This Court has previously found that "one convicted of manslaughter under a murder indictment cannot complain of the giving of a murder instruction." ***Crump v. State***, 375 So. 2d 225, 227 (Miss. 1979) (citing ***Hailes v. State***, 315 So. 2d 917 (Miss. 1975)). This reasoning is applicable to the case sub judice. Randle's other sentencing option was the death penalty. Thus,

these instructions did not harm him.

¶27. As to the merit of Randle's claims, this Court finds none. First, Instruction SSP-4B is not vague. It sets out the aggravating circumstances and the mitigating circumstances and clearly explains to the jurors that they must weigh one set against the other and what sentence is necessitated by the results of their weighing process. Second, the Supreme Court of the United States has been held that the "heinous, atrocious and cruel" aggravating factor must be further defined in order to pass constitutional muster. *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Further, this Court has expressly approved the following language:

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders-the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

*Knox v. State*, 805 So.2d 527, 533 (Miss. 2002). While the language of SSP-5 is not identical to this language, we find that it is sufficient.

¶28. We find that Randle is procedurally barred from pursuing these allegations of error on appeal, and we further note that they are without merit.

## CONCLUSION

¶29. No reversible error occurred below. Thus, for the foregoing reasons, this Court affirms the judgment below.

¶30. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

> **PITTMAN, C.J., McRAE, P.J., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. EASLEY, J., NOT PARTICIPATING.**