# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-01254-SCT

*WILLIAM THOMAS CHISHOLM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/2021 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| TRIAL COURT ATTORNEYS: | MARK G. WILLIAMSON |
| | WILLIAM R. LABARRE |
| | CHRISTOPHER SCOTT ROUTH |
| | MARC DARREN AMOS |
| | SCOTT WINSTON COLOM |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MARK ANDREW CLIETT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DANIELLE LOVE BURKS |
| | LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/08/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. William Thomas Chisholm killed his former girlfriend, Dr. Shauna Witt, by shooting her to death. Dr. Witt had broken up with Chisholm and recently obtained a restraining order against him. She was examining a patient at her optometry office in Starkville when Chisholm barged in. He opened the office's front door, walked through the hall to an interior exam room, and overpowered Dr. Witt, forcing his way into the exam room. He then pulled

out a pistol. Dr. Witt was able to squirm past Chisholm and out of the examination room into the hall. But as she ran for her life, Chisholm opened fire—shooting her in the back and in the back of her head. Dr. Witt collapsed against the foyer wall, dying near the office's front door.

¶2. Eyewitnesses saw the shooting. And surveillance video footage captured the audio of shots being fired. It also showed Chisholm pacing between the optometry office and Wal-Mart Vision Center—with pistol still in hand—immediately after he killed Dr. Witt. Police apprehended Chisholm in his car in the Wal-Mart parking lot and recovered the pistol. A jury convicted Chisholm of capital murder. He was sentenced to life imprisonment.

¶3. On appeal, Chisholm's main argument centers on how the State charged and proved burglary—the underlying felony pled in his capital murder charge. Specifically, the State charged that Chisholm committed capital murder by killing Dr. Witt in the commission of a burglary. The State based the predicate burglary on Chisholm's breaking and entering the office building, intending to commit "an assault" therein. Contrary to Chisholm's assertions, the State adequately pled a burglary-based capital murder. Our precedent makes clear the State was not required to plead each and every element of the assault underlying the burglary or to allege the assault was "aggravated"—since both statutory and notice requirements were met.

¶4. Chisholm also argues because the building, which included Dr. Witt's office, was open to the public, he could not have committed the predicate burglary by entering the building, intending to commit assault. We disagree. The required breaking for burglary "can

be actual or constructive." ***Templeton v. State***, 725 So. 2d 764, 766 (Miss. 1998). "[C]onstructive breaking is present where the invitation [to enter the home or business] is gained by deceit, pretense, or fraud." ***Id.*** at 767. In such cases, we have held that the invitation is "irrelevant." ***Id.*** In ***Templeton***, this Court concluded that "an owner would not knowingly grant someone permission to enter his house with the intent to commit the crime of burglary, much less the crime of murder." ***Id.*** The same is true for business owners—the invitation to enter the premises clearly does not extend to those who intend to commit crimes. *See, e.g.*, ***Fulgram v. State***, 12 So. 3d 558, 561 (Miss. Ct. App. 2009).

¶5. Dr. Witt saw patients by appointment at her private optometry practice. Not only was Chisholm not a patient, but Dr. Witt had recently obtained a restraining order against him. She had also directed her employees to call 911 if Chisholm ever showed up at her office—which they did. So he was clearly not a typical business guest; in fact, he was not welcome. Further, in his quest to kill Dr. Witt, Chisholm not only entered the optometry office door, but he also overpowered Dr. Witt, breaking into an interior examination room where she was treating a patient—somewhere he unquestionably lacked permission to be. So burglary was sufficiently proved.

¶6. We also find no merit to Chisholm's additional challenges to several of the judge's discretionary evidentiary rulings. We thus affirm his conviction and sentence.

### Facts and Procedural History

I.     **Murder of Dr. Witt**

3

¶7.    Chisholm and Dr. Witt became romantically involved around 2012.  When Dr. Witt ended the relationship in 2017, Chisholm became angry, allegedly burning her belongings she kept at his home.  Dr. Witt sought a protective order against Chisholm, which a judge entered around December 12, 2017.  The order expired December 30, 2017.

¶8.    Dr. Witt contracted with Wal-Mart for office space for her optometry office, which was located on the front side of the department store.  Her office was accessed separately from Wal-Mart.  While the general public entered Wal-Mart through doors at the front of the store, Dr. Witt's optometry patients did not.  Her optometry patients entered her office through a separate door located on the front side of the Wal-Mart building, just off the department store's parking lot.[1]

¶9.    On January 13, 2018, Dr. Witt was seeing patients at her optometry office. Heather Ashley—who worked for Dr. Witt and the Vision Center—and Kaylace Dorman, Dr. Witt's optometrist assistant, were both working that day.  Between 9:20 and 9:35 a.m., Chisholm entered Dr. Witt's optometry office through the exterior door from the parking lot.  When Ashley saw Chisholm in the office, she immediately called 911.

¶10.   Chisholm walked toward the eye examination room where Dr. Witt was examining patient Amberley McCarter.  The door was closed.  So he began knocking on the door.  According to her patient, Dr. Witt opened the door and told Chisholm to leave.  She then closed and locked the door.  But Chisholm did not leave.  He instead continued to knock.

---

[1] Dr. Witt's office connected to the back of the Wal-Mart Vision Center through an inner corridor.  The Vision Center is where Wal-Mart displays and sells eyeglasses and related products.  Shoppers access the Wal-Mart Vision Center through the inside of the department store.

When Dr. Witt eventually opened the door again, Chisholm began "barging" in. The patient remembered Chisholm "was pushing in" and Dr. Witt "was pushing out. They was [sic] fighting over the door." And he eventually "overpowered her and got into the room." Chisholm then began reaching into his pocket and pulled out a gun. Dr. Witt begged him to "stop," pleading "no, Tommy, stop[.]" She tried to keep him from drawing the gun, but he managed to pull out the pistol. According to the optometrist assistant, Dorman, Dr. Witt saw the gun, and was able to slip under Chisholm's arm. When Dr. Witt took off running for the office exit, Chisholm opened fire. She fell into the wall by the exit door and died. An autopsy report showed she died from two gunshot wounds—one to the back and another to the back of her head.

¶11. Chisholm left the optometrist office through the inner corridor leading into the Vision Center. Surveillance video shows him holding his pistol, walking back and forth between the optometrist office and Vision Center. Soon after, he returned to his car in the parking lot. Officers arrived and instructed Chisholm to get out of his vehicle. When he exited the car, officers directed him to get down on the asphalt. He began telling the officers to "kill [him]." Chisholm was placed in a patrol car. When the officers walked off, he kicked out the rear passenger window.

¶12. Investigators processed the scene and recovered eight shell casings. They found the casings "in almost a trail" from the exam room to the door where Dr. Witt had collapsed. They also located four rounds stuck in the wall. Officers recovered Chisholm's Springfield Armory 9mm pistol from his passenger seat, along with a loaded magazine and holster.

## II.    Capital Murder Charge

¶13.    A grand jury charged Chisholm with capital murder with the underlying felony of burglary and one count of aggravated assault.  Chisholm filed a motion to quash the indictment.  He argued it "fail[ed] to state the underlying offense of the alleged [b]urglary."  The State confessed the motion and reindicted Chisholm for capital murder in the commission of a burglary—this time pleading that Chisholm intended to commit an assault inside the building.  Chisholm pled not guilty.

¶14.    On July 15, 2021, Chisholm notified the State of his intent to pursue an insanity[2] defense and forwarded a report by his retained expert, Dr. Jennifer Carroll.

## III.    Trial

¶15.    At trial, the State called multiple eyewitnesses to the shooting, along with investigators and medical personnel.  Video surveillance from the Wal-Mart Vision Center, a recording of Ashley's 911 call, law enforcement body and car camera footage, and crime scene photos were admitted and presented to the jury.  So were shell casings and rounds recovered from the scene.

¶16.    When the State rested, Chisholm tried to call his purported expert forensic psychologist, Carroll.  Carroll told the jury that she had received a bachelor of science in psychology, a master's degree in counseling psychology, and a Ph.D. in general psychology.  In 2005, she became a licensed professional counselor.  As part of her training, she was

---

[2] "The test for insanity is whether the defendant was unable to distinguish right and wrong at the time the act was committed." *Roundtree v. State*, 568 So. 2d 1173, 1181 (Miss. 1990) (quoting *White v. State*, 542 So. 2d 250, 252 (Miss. 1989)).

"exposed" to forensic psychology while interning at the Mississippi State Hospital at Whitfield, where she learned about various testing methods. After detailing her experience working in mental health facilities, Carroll represented that she had been qualified and accepted by "[c]ourt[s] as an expert in either forensic or clinical psychology "[a]pproximately 30 maybe [times]." Chisholm tendered Carroll as an expert witness in forensic and clinical psychology.

¶17. The State then questioned Carroll about her qualifications. Right out of the gate, Carroll admitted she was not a licensed psychologist. And the reason she was not a licensed psychologist was because she was not qualified. The university from which she received her Ph.D. in psychology was not accredited by the American Psychology Association (APA). Further, because her Ph.D. was primarily online, she never completed the minimum one year of continuous full-time residency at her doctoral university, as required for licensure. Neither did she complete the required pre-doctoral internship nor post-doctoral supervision.

¶18. Under cross-examination by the State, Carroll conceded she did not "qualify on any level to hold [her]self out to be a psychologist in the State of Mississippi." Moreover, Carroll's doctoral degree was in general psychology—not forensic psychology. She had never even studied forensic psychology.

¶19. Carroll was not aware of the APA guidelines for forensic psychologists and did not apply them to her report. Carroll further admitted her licensure as a professional counselor did not allow her "to offer an opinion forensically to this Court in the field of clinical psychology." In fact, Carroll conceded it would be "totally outside the parameters of [her]

7

practice as an LPC" for her to offer an expert opinion on Chisholm's mental capacity at the time of the murder.

¶20. For these varied reasons, the State objected to Carroll testifying as an expert in forensic psychology. The trial court sustained the objection.

¶21. Chisholm sought a mistrial, arguing Carroll had misrepresented herself, claiming she could provide expert testimony on Chisholm's sanity. The State countered that a party's failure to qualify an expert was not a legal basis for a mistrial. The trial judge agreed and denied the motion. The defense requested to use the State's intended rebuttal expert witness to Carroll's testimony in Chisholm's case-in-chief. So, after reaching an agreement with the State, the defense called Dr. Robert Storer via previous video deposition. The defense also requested and was granted a jury instruction on Chisholm's insanity defense.

¶22. After deliberating, the jury found Chisholm guilty of capital murder. The judge sentenced him to life imprisonment without parole.[3]

**Discussion**

¶23. On appeal of his conviction, Chisholm raises a variety of issues relating to the admission of evidence and exclusion of his proposed expert witness. He also insists the judge should have instructed the jury on heat-of-passion manslaughter, the State suppressed his own cell phone records, and the judge wrongly refused to quash his indictment. Finally, he attacks the sufficiency and weight of the evidence supporting his capital murder conviction. But after review, we find each of his arguments lacks merit.

---

[3] Prior to Chisholm's trial, the State announced it would not be pursuing the death penalty.

8

## I.       Evidentiary Rulings

¶24.    Chisholm disputes a number of the trial judge's evidentiary calls, which this Court reviews for abuse of discretion. *Gales v. State*, 153 So. 3d 632, 638 (Miss. 2014) (citing *Brown v. State*, 965 So. 2d 1023, 1026 (Miss. 2007)).

### A.       *Chain of Custody*

¶25.    First, Chisholm broadly asserts "multiple pieces of evidence were admitted over objection into evidence." He then references page numbers in the trial transcript, noting his lawyer's objections to the admission of eight shell casings and four rounds recovered from Dr. Witt's optometry office. He also objected to admission of the protective order police found at Chisholm's house. Chisholm essentially argues the State failed to prove the chain of custody for these items because officers who initially gathered and sealed the evidence did not testify.

¶26.    The initial problem with Chisholm's argument is that "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (alteration in original) (quoting *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)). And Mississippi courts have "never required the proponent to produce every person who handled the object" to establish chain of custody. *Butler v. State*, 592 So. 2d 983, 985 (Miss. 1991); *see also Cyrus v. State*, 248 So. 3d 760, 762 (Miss. 2018) ("[I]t is unnecessary that every handler of the evidence testify." (citing *Tubbs v. State*, 185 So. 3d 363, 369 (Miss. 2016))). So a gap in the chain does not, itself, bar admission.

¶27.    To exclude evidence, there must be "an indication or reasonable inference . . . 'of probable tampering with the evidence or substitution of the evidence.'" ***Id.*** And this Court recognizes "[a] presumption of regularity applies to the actions of the public officers." ***Id.*** Indeed, the burden is on the defendant to show otherwise. And here, Chisholm has produced zero evidence of tampering, much less that the chain of custody was even broken.

¶28.    The testifying officer—Sergeant John Michael Lay—was the lead investigator tasked with supervising the crime scene. Even if he did not seal and sign each evidence bag himself, he observed and directed the officers who gathered and secured evidence. Before each piece of evidence was admitted, Sergeant Lay explained the steps taken to secure it and ensure the objects were what they were purported to be—evidence gathered from the crime scene and from Chisholm's home.

¶29.    Because a sufficient foundation of authenticity was laid, the trial judge was well within his discretion to admit the firearm evidence and restraining order over Chisholm's objection.

### B.    Prior Bad Acts

¶30.    Next, Chisholm argues the trial judge erroneously admitted evidence of his prior bad acts, particularly his behavior towards Dr. Witt.[4] He mostly points to Ashley's testimony that Chisholm burned Dr. Witt's possessions, leading to the restraining order against him.

¶31.    But at trial, Chisholm made no character evidence objections. Instead, when the now complained of specific instances were mentioned, he merely objected to hearsay. And the

---

[4] Chisholm also filed a pro se supplemental brief, in which the sole issue he raised was the admission of prior bad acts.

judge overruled each objection. This Court has been clear that "[a]sserting grounds for an objection on appeal that differ from the ground given for the objection at the trial level does not properly preserve the objection for appellate review." *Saddler v. State*, 297 So. 3d 234, 238 (Miss. 2020) (quoting *Roberts v. State*, 234 So. 3d 1251, 1262 (Miss. 2017)). In other words, Chisholm has waived this argument. *See Smith v. State*, 986 So. 2d 290, 296 (Miss. 2008) ("issues not brought before the trial court are deemed waived and may not be raised for the first time on appeal" (quoting *Tate v. State*, 912 So. 2d 919, 928 (Miss. 2005))).

¶32. Clear waiver aside, Chisholm's argument still fails. It is true that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1). But such evidence may still be permitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). It may also be admissible when "integrally related in time, place, and fact to the crime for which the defendant is being tried in order to allow the State to tell a coherent story of what happened to the victim." *Flowers v. State*, 773 So. 2d 309, 324 (Miss. 2000) (citing *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987)).

¶33. Dr. Witt had directed her coworkers to call 911 if Chisholm ever showed up to the office. And the restraining order informed the jury why. To explain why Dr. Witt obtained the restraining order required that the jury know Chisholm had recently burned Dr. Witt's possessions. In short, the restraining order and related evidence helped the jury understand the full story leading to Dr. Witt's murder.

11

¶34.   Dr. Witt had secured this restraining order just one month before her murder.  So the restraining order served as a method of proving Chisholm's motive and intent, especially given his purported insanity defense.   So even if Chisholm had not waived this argument—which he clearly did—it lacks merit.  The trial judge did not abuse his discretion by allowing testimony of Chisholm's prior bad acts.

### C.     Expert Witness

¶35.   Chisholm's final evidentiary challenge centers on the trial judge's exclusion of Jennifer Carroll as an expert witness in clinical and forensic psychology.   On appeal, Chisholm insists Carroll was qualified.   But this argument cuts against Carroll's trial testimony—even she admitted she was not qualified to hold herself out as an expert in clinical and forensic psychology.

¶36.   Without question, "[b]efore providing expert opinion testimony, a witness must be qualified, tendered, and accepted as an expert under Rule 702 of the Mississippi Rules of Evidence." *Chaupette v. State*, 136 So. 3d 1041, 1045 (Miss. 2014) (citing *Cotton v. State*, 675 So. 2d 308, 312 (Miss. 1996)).   Having the requisite qualification is key, as expert testimony "offered from an unqualified witness" is "reversible error." *Hobgood v. State*, 926 So. 2d 847, 854 (Miss. 2006) (citing *Cotton*, 675 So. 2d at 312).

¶37.   Carroll initially testified she had a Ph.D. in psychology and had trained in forensic psychology testing while interning at Whitfield.  She also claimed she had been accepted as an expert in clinical or forensic psychology in past trials.  But when pressed by the State, she quickly retracted these qualifications.

¶38.    Carroll readily admitted she *was not and could not become* a licensed psychologist. She made clear she lacked the required education and training to do so.  Her online Ph.D. was not from an APA accredited university—it was in general, not clinical or forensic, psychology.  On top of that, Carroll conceded she had conducted no peer-reviewed research in clinical or forensic psychology.  She further admitted she lacked knowledge about APA guidelines for forensic psychology.  So when evaluating Chisholm, she obviously did not follow those guidelines.

¶39.    Instead, Carroll was licensed as a professional counselor (LPC). She conceded at trial, this license did not allow her "to offer an opinion forensically to this Court in the field of clinical psychology."  And she admitted that offering an expert opinion on Chisholm's mental capacity at the time of the murder would be "totally outside the parameters of [her] practice as an LPC."  For these varied reasons, the trial judge did not abuse his discretion by excluding her from testifying.

## II.    Mistrial

¶40.    Curiously, Chisholm alternatively argues that the trial court erred by denying his motion for mistrial, made after the judge excluded Carroll as an expert witness.  Chisholm insists Carroll had assured his lawyer that she was qualified to testify, despite not being a licensed psychologist.  On appeal, Chisholm asserts that a mistrial was warranted because the jury had been tainted by Carroll's testimony "and the fact that she was asked the same questions by counsel for both sides and provided different answers." He further argues

mistrial was warranted because of "misrepresentations made by Dr. Jennifer Carroll in preparation of the defense."

¶41. "Whether to grant a motion for mistrial is within the sound discretion of the trial court." *Pulphus v. State*, 782 So. 2d 1220, 1223 (Miss. 2001) (citing *Ragin v. State*, 724 So. 2d 901, 904 (Miss. 1998)). And a trial judge should only declare a mistrial "when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Sharkey v. State*, 265 So. 3d 151, 155 (Miss. 2019) (quoting *Pitchford v. State*, 45 So. 3d 216, 240 (Miss. 2010)).

¶42. Here, there was no error in the proceedings. Chisholm proffered Carroll as an expert. She testified about her qualifications. And then the State conducted its voir dire of Carroll. The State's challenging Carroll's qualifications was neither surprising nor unjustly prejudicial—rather, it was to be expected. In both bench trials and trials by jury, "the purpose of qualifying a witness as an expert, is to allow opposing counsel the opportunity to challenge the witness' credentials and qualifications prior to testimony being proffered." *Hobgood*, 926 So. 2d at 854-55 (citing *Sample v. State*, 643 So. 2d 524, 530, (Miss. 1994)). Chisholm's counsel was wholly aware Carroll's qualifications would likely be questioned at trial. And he chose to tender—as his expert in clinical and forensic psychology—someone he knew was not a licensed psychologist, nor even a clinical or forensic psychologist. The trial judge properly excluded her expert opinion based on Rule 702. And Chisholm has cited no authority that failure to qualify one's chosen expert under Rule 702 is cause for mistrial.

¶43. Neither can Chisholm rely on his claim that his counsel was misled by Carroll's assurances she was qualified to testify and had testified previously as an expert forensic psychologist. It is the trial judge who acts "as gatekeeper on questions of admissibility of expert testimony." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 40 (Miss. 2003). Counsel was aware Carroll could not automatically testify as an expert simply because she believed she was qualified or had been allowed to testify previously. Instead, Carroll could only testify in Chisholm's trial if she satisfied the trial judge. This required that she demonstrate the requisite qualifications as a forensic psychologist, which she could not do.

¶44. Further, there was not irreparable prejudice to Chisholm. Carroll's testimony, while perhaps beneficial to Chisholm's insanity claim, would not have conclusively resolved this issue. Instead, it was up to the jury to decide Chisholm's purported insanity. *See Sanders v. State*, 63 So. 3d 497, 504 (Miss. 2011) (citing *Laney v. State*, 486 So. 2d 1242, 1245 1246 (Miss. 1986)). And the jury did decide this issue. Following Carroll's exclusion, the judge allowed the defense to offer video testimony from Dr. Storer—taken in anticipation of having to rebut Carroll's expert testimony—as evidence of Chisholm's alleged insanity. And the jury was instructed on it.

¶45. So the trial judge did not abuse his discretion by denying Chisholm a mistrial.

### III. Manslaughter Instruction

¶46. Chisholm next argues he was entitled to a heat-of-passion manslaughter jury instruction based primarily upon testimony from Dr. Witt's patient, McCarter. Whether a defendant is entitled to a lesser-included-offense instruction is a question of law. So this

Court's review of the denial of that instruction is de novo. *Sharkey*, 265 So. 3d at 157 (citing *Downs v. State*, 962 So. 2d 1255, 1258 (Miss. 2007)). A party is entitled to a lesser-included-offense instruction only if there is "an evidentiary basis in the record" to support it. *Batiste v. State*, 121 So. 3d 808, 844 (Miss. 2013) (citing *Anderson v. State*, 79 So. 3d 501, 505 (Miss. 2012)). And here, no evidentiary basis exists.

¶47. Heat-of-passion manslaughter is defined as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2020). Notably, the fact "that the accused *subjectively* experienced passion and anger is not enough to reduce a killing to manslaughter." *Abeyta v. State*, 137 So. 3d 305, 310 (Miss. 2014) (emphasis added). "Rather, the impassioned reaction of the accused must have been reasonable: 'the passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation.'" *Id.* at 310-11 (quoting *Agnew v. State*, 783 So.2d 699, 703 (Miss. 2001)).

¶48. Instead of showing a reasonable reaction to a provocation, the trial record shows the exact opposite. There is no record evidence that Dr. Witt provoked Chisholm. Rather, Chisholm showed up to her office uninvited, with a loaded pistol, and forced his way into her examination room. Chisholm wholly relies on testimony from the patient, McCarter, to support his heat-of-passion claim. But McCarter testified that Dr. Witt told Chisholm to leave and had locked the office door on him when he kept knocking and ultimately before

16

he "barg[ed]" into the room. As soon as Chisholm reached into his pocket for his gun, Dr. Witt began trying to push back and begged him to stop. And when Dr. Witt saw the gun, she took off running. Chisholm shot her multiple times in the back and the back of the head. This is not provocation on Dr. Witt's part—it is the behavior of someone trying to escape.

¶49. Because there was simply no objective evidence of provocation, the trial judge did not err by denying an instruction on heat-of-passion manslaughter.

### IV. *Brady* Violation

¶50. Chisholm also broadly asserts that the State violated ***Brady v. Maryland***[5] by not "dump[ing]" his and Dr. Witt's cell phones, which included exculpatory evidence. In the same vein, he claims that the State recovered his laptop and journal but did not disclose the contents of either in discovery.

¶51. This Court reviews whether a ***Brady*** violation occurred de novo. ***Thomas v. State***, 45 So. 3d 1217, 1219 (Miss. 2010) (citing ***United States v. Moore***, 452 F.3d 382, 387 (5th Cir. 2006)). To establish a ***Brady*** violation, Chisholm must show:

(1) that the government possessed evidence favorable to the defendant (including impeachment evidence);

(2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence;

(3) that the prosecution suppressed the favorable evidence; *and*

(4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

---

[5] ***Brady v. Maryland***, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963).

17

*Carr v. State*, 873 So. 2d 991, 999 (Miss. 2004) (emphasis added) (citing *King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995)). Chisholm cannot prove *any* of these factors, let alone all of them. In fact, his brief to this Court does not even mention the standard for a *Brady* violation.

¶52. Chisholm merely states that his and Dr. Witt's cell phone records contained "exculpatory evidence" and should have been "dumped." He contends that the records would have shown that the two "might be considering reconciling" and would show that he was "not trespassing on the day in question." Beyond that, he lists no specifics of what the messages would have revealed. This is simply not enough to meet the *Brady* requirement of showing that the prosecution suppressed favorable evidence to Chisholm's case. *See Montgomery v. State*, 891 So. 2d 179, 183 (Miss. 2004).

¶53. Further, Chisholm makes no mention of any efforts on his part to obtain the records—not even those of his *own* cell phone. And the State is not required to seek out and discover "all possible exculpatory evidence" for a defendant. *Id.* (citing *Randle v. State*, 827 So. 2d 705, 712 (Miss. 2002)).

¶54. Chisholm also briefly mentions that his journal and laptop were taken from his home and not produced by the State. But he fails to explain how either the journal or laptop would have proved exculpatory—only that they were "exculpatory in nature." So again, Chisholm cannot even meet the first requirement of *Brady*—that the State possessed exculpatory evidence at all. *See Montgomery*, 891 So. 2d at 183.

¶55. In short, the burden to prove a ***Brady*** violation rested squarely on Chisholm. And he failed to meet that burden.

## V. Indictment

¶56. Chisholm focuses much of his brief on his argument that the trial judge should have quashed his indictment, or in the alternative, reduced his charge from capital murder to first-degree murder. Chisholm bases this assertion wholly on the burglary portion of the indictment, claiming it lacked specificity.[6] "The sufficiency of an indictment is a question of law, and therefore is reviewed de novo." ***Carson v. State***, 212 So. 3d 22, 31 (Miss. 2016) (citing ***Berry v. State***, 996 So. 2d 782, 785-86 (Miss. 2008)). An indictment will be considered legally sufficient "so long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused[.]" ***Id.*** (quoting ***Farris v. State***, 764 So. 2d 411, 421 (Miss. 2000)).

¶57. Here, the nature of the cause was capital murder—namely, "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . burglary . . . ." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2020). To that end, Chisholm's indictment read:

> that WILLIAM THOMAS CHISHOLM late of the County aforesaid, on or about the 13th day of January, 2018, in the County aforesaid, did unlawfully, willfully, feloniously, and with or without the deliberate design to effect death, kill Shauna L. Witt, a human being, without the authority of law and not in necessary self defense, while in the commission of the felony crime of

---

[6] To clarify, the indictment at issue before this Court is the second iteration, obtained by the State after confessing the first was defective and re-indicting Chisholm.

> burglary, in that William Thomas Chisholm did willfully, unlawfully, feloniously and burglariously break and enter into a building located at 1010 Highway 12 West, Starkville, Oktibbeha County, Mississippi, the property of Walmart, in which goods, merchandise, equipment or valuable things were kept for use or sale, *with the intent to commit an assault therein*; in violation of Miss. Code Ann. § 97-3-19(2)(e); contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Mississippi.

(Emphasis added.) Chisholm zeroes in on the phrase "with the intent to commit an assault therein." He claims this phrase was insufficient to allege the commission of the underlying felony of burglary.[7] He gives two reasons for this purported insufficiency—(1) that this phrase fails to identify the intended victim of his assault and (2) that it fails to specify the type of assault. But this Court has previously rejected both of these arguments.

¶58. First, in 2016, in *Carson*, this Court expressly overruled prior precedent that had "purported to make the identity of the victim of the underlying felony . . . an element of the crime of capital murder . . . ." *Carson*, 212 So. 3d at 34 (overruling in part *Rowland v. State*, 98 So. 3d 1032 (Miss. 2012)). So an indictment for capital murder that names the murder victim but does not name the victim of the underlying felony is not fatally flawed. *Id.* at 31-34.

---

[7] Chisholm was charged with killing Dr. Witt in the commission of a burglary of a non-dwelling. This crime entails the

> breaking and entering, in the day or night, any shop, store, booth, tent, warehouse, or other building or private room or office therein, water vessel, commercial or pleasure craft, ship, steamboat, flatboat, railroad car, automobile, truck or trailer in which any goods, merchandise, equipment or valuable thing shall be kept for use, sale, deposit, or transportation, with intent to steal therein, or to commit any felony . . . ."

Miss. Code Ann. § 97-17-33(1) (Rev. 2020).

¶59. Second, this Court has consistently held that the phrase "with the intent to commit an assault therein" fully notifies the defendant of the charge of burglary. *Body v. State*, 318 So. 3d 1104, 1114 (Miss. 2021) (citing *Booker v. State*, 716 So. 2d 1064, 1068 (Miss. 1998)). As explained in *Booker*, while "the particular felony intended must be specified[,] [t]he allegation of the ulterior felony intended need not . . . be set out as fully and specifically as would be required in an indictment for the actual commission of that felony." *Booker*, 716 So. 2d at 1068 (quoting 13 Am. Jur. 2d *Burglary* § 36). Rather, "it is ordinarily sufficient to state the intended offense generally, as by alleging an intent to steal, or commit the crime of larceny, rape or arson." *Id.* (citing 13 Am. Jur. 2d *Burglary* § 36 (1964)). And in *Booker*, this Court held "the indictment [that had] charged him with burglary with the intent to commit assault, in general terms, provided sufficient notice of the charges against him." *Id.*

¶60. Chisholm insists that *Booker*'s holding does not apply to him because he was charged with burglary of a *building*, as opposed to burglary of a dwelling. As he points out, burglary of a dwelling requires a breaking and entering "with the intent to commit some crime therein." Miss. Code Ann. § 97-17-23(1) (Rev. 2020). Burglary of a building requires a breaking and entering "with intent to steal therein, or to commit any felony." Miss. Code Ann. § 97-17-33(1). So Chisholm insists the indictment had to specify that he intended to commit aggravated or sexual assault. But Chisholm cites no authority for this assertion. In fact, he concedes the Mississippi Court of Appeals rejected this very same argument in *Lancaster v. State*, 878 So. 2d 140, 142-43 (Miss. Ct. App. 2004)—a decision he merely brushes off as wrongly decided.

21

¶61. But *Lancaster* was not wrongly decided. In that case, the defendant, like Chisholm, had been charged with capital murder in the commission of a burglary of a building. His indictment charged that he broke and entered the building with "the intent to commit an assault therein." *Id.* at 142. The defendant claimed his capital murder indictment was defective because it "did not indicate what *sort* of assault [or] what degree of bodily injury . . . ." *Id.* at 143. Relying on *Booker*, the Court of Appeals held that such specificity was not required. Lancaster was not being charged with assault. Instead, Lancaster had been charged with capital murder. *Id.* (citing *Booker*, 716 So. 2d at 1068). And that court held the indictment's language "sufficiently informed [Lancaster] of the underlying felony and the essential facts constituting the offense of capital murder." *Id.*

¶62. For this same reason, Chisholm's indictment sufficiently informed him of the *capital murder* charge. Here, the indictment clearly notified Chisholm that he was being charged with killing Dr. Witt during the commission of a burglary of a building by specifying Chisholm feloniously broke and entered into a commercial building where goods, merchandise, equipment, or valuable things were kept for use or sale. And it also specified the felony Chisholm intended to commit—assault. *See* Miss. Code Ann. § 99-17-33(1). Again, when charging *burglary*, "the allegation of the ulterior felony intended need not . . . be set out as fully and specifically as would be required in an indictment for the actual commission of that felony[.]" *Booker*, 716 So. 2d at 1068 (quoting 13 Am. Jur. 2d *Burglary* § 36). This is likewise true when charging burglary as the underlying felony for capital murder—nothing more specific is required. *Lancaster*, 878 So. 2d at 142-43.

22

¶63. Chisholm also argues that the eventual jury instruction on burglary "agrees with [his] argument" because it instructed that the jury had to find Chisholm broke and entered the Wal-Mart building "with the intent to shoot Shauna Witt." According to Chisholm this instruction "constructively amended" the indictment. But Chisholm is incorrect as to the definition of a constructive amendment. "[A] constructive amendment of the indictment occurs when the proof and instructions *broaden the grounds* upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." **Bell v. State**, 725 So. 2d 836, 855 (Miss. 1998) (emphasis added) (citing **United States v. Miller**, 471 U.S. 130, 105 S. Ct. 1811, 85 L. Ed. 2d 99 (1985)). And here the jury instruction only further narrowed the grounds upon which the jury could find Chisholm guilty. Not only did the instruction narrow these grounds, but Chisholm expressly withdrew his objection to this instruction during the jury instruction conference. So any potential appellate challenge to the instruction is waived. **Smith v. State**, 724 So. 2d 280, 300 (Miss. 1998) (holding that a defendant "may not object for a failure to instruct the jury . . . when he withdrew the submitted instruction").

¶64. Chisholm's indictment was neither defective nor was it constructively amended.

## VI. Verdict

¶65. Finally, Chisholm argues the jury's verdict was against the weight of the evidence. He appears, however, to confuse this with the sufficiency of the evidence. Regardless, Chisholm challenges only the underlying burglary portion of his capital-murder

conviction—that the State failed to prove the breaking element and that Chisholm intended to commit an assault inside the building. But both of Chisholm's arguments fail.

### A. Sufficiency of the Evidence

¶66. The test for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State and giving the State the benefit of all favorable inferences reasonably drawn from the evidence, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Williams v. State*, 285 So. 3d 156, 159 (Miss. 2019) (citing *Martin v. State*, 214 So. 3d 217, 222 (Miss. 2017); *Hughes v. State*, 983 So. 2d 270, 276 (Miss. 2008)). With this standard in mind, the State's evidence was sufficient to convict Chisholm of capital murder.

### 1. Breaking

¶67. First, Chisholm argues that because the murder occurred in an office connected to Wal-Mart, a store open to the public, there can be no breaking. But both this Court and the Court of Appeals have clearly rejected the argument that a business open to the public cannot be burglarized.

¶68. This is because the required breaking for burglary "can be actual or constructive." *Templeton*, 725 So. 2d at 766. "[C]onstructive breaking is present where the invitation [to enter the home or business] is gained by deceit, pretense, or fraud." *Id.* at 767. In such a case, this Court has held that the invitation is "irrelevant." *Id.* In *Templeton*, this Court concluded that, because "an owner would not knowingly grant someone permission to enter his house with the intent to commit the crime of burglary, much less the crime of murder, as

24

was ultimately committed by Templeton in the case at bar, Templeton's entry was obviously gained by deceit, pretense or fraudulent means." *Id.* So there clearly had been a constructive breaking. *Id.*; *see also* **Haynes v. State**, 744 So. 2d 751, 753 (Miss. 1999) ("[A] defendant was properly convicted of burglary of a dwelling where the defendant did not actually break into the dwelling, but rather had been invited into the house by the homeowner, but with the full intention of committing unlawful acts in the house.").

¶69. This is also true for business owners—the invitation to enter the premises clearly does not extent to those whose real intent is to commit crimes. In **Fulgham v. State**, 12 So. 3d 558 (Miss Ct. App. 2009), then-Chief Judge King, writing for the Court of Appeals, held constructive breaking had been established by evidence that two men had entered a deer processing shop after hours to steal meat. While the processor permitted hunters to enter the shop after hours to drop off deer to be processed, the defendant had "entered . . . with the unlawful intent to steal meat, not to leave deer for processing." *Id.* at 561. In other words, the defendant "entered the store with a purpose outside of [the owner's] consent," so the evidence was sufficient to support a constructive breaking. *Id.*

¶70. The same is true here. The invitation by Wal-Mart's Vision Center was for purchasing vision-related products. Further, the invitation to Dr. Witt's separate clinic, connected to the Vision Center, was for patients and those who had business to conduct. Clearly, Chisholm had no such intent when he entered Dr. Witt's office that day. More than that, the State's evidence established Chisholm specifically *was not* invited to Dr. Witt's office. Dr. Witt had recently obtained a restraining order against him, and her staff had been

25

instructed to call 911 if he ever set foot on the premises, which they immediately did. And Dr. Witt herself tried to lock Chisholm out of the exam room—a place he clearly had no right to be.

¶71. In other words, Chisholm walked into a public place with the intent not to shop or utilize the Vision Center's or Dr. Witt's optometry services, but to assault Dr. Witt. This is sufficient evidence of a constructive breaking.

*2.     Intent to Commit Assault*

¶72. On appeal, Chisholm also argues that the State did not provide sufficient evidence to prove he entered the building with the intent to commit an assault therein. But "it is well settled that intent can be inferred from a defendant's actions." ***Friley v. State***, 879 So. 2d 1031, 1035 (Miss. 2004) (citing ***Moody v. State***, 841 So. 2d 1067, 1092-93 (Miss. 2003)). And Chisholm's actions clearly led to an inference that he intended to assault Dr. Witt. On the day of Dr. Witt's murder, Chisholm entered Dr. Witt's office with a loaded gun. And he did not ask to see her. He instead went straight to the exam room. Eyewitness testimony evidenced that Dr. Witt did not provoke Chisholm—she merely asked him to leave. But when she closed the door and locked it, he continued to knock. She then opened the door and he began barging in, drawing his pistol. And within minutes of Chisholm entering the building, he killed Dr. Witt. Chisholm's actions on the day of the murder were unquestionably sufficient for a jury to find he intended to assault Dr. Witt.

¶73. This Court is "not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." ***Lenoir v. State***, 222 So. 3d 273,

279 (Miss. 2017) (emphasis omitted) (quoting *Poole v. State*, 46 So. 3d 290, 293 (Miss. 2010)). Instead, this Court must determine "whether a reasonable juror could rationally say that the State did" prove those elements. *Id.* (quoting *Poole*, 46 So. 3d at 294). And because a reasonable juror could rationally say the State proved the elements of breaking and Chisholm's intent to commit an assault therein, his sufficiency of the evidence argument fails.

### B. Weight of the Evidence

¶74. When reviewing challenges to the weight of the evidence, this Court views the evidence "in the light most favorable to the verdict[.]" *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017) (citing *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). This Court will only disturb a verdict "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (quoting *Lindsey*, 212 So. 3d at 45). And that is not what occurred here. The State presented a plethora of evidence against Chisholm, including surveillance footage, shell casings, ammunition rounds, and Dr. Witt's autopsy report. Chisholm stayed at the scene of the crime until authorities arrived to arrest him. And the State had three eyewitnesses—Dorman, Ashley, and McCarter—recount the events leading up to Dr. Witt's murder. Simply put, the evidence overwhelmingly supported his conviction. And allowing his conviction to stand certainly does not constitute an unconscionable injustice.

### Conclusion

27

¶75. Each of Chisholm's arguments lacks merit.  Thus, we affirm Chisholm's conviction of capital murder.

¶76. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**